Commonwealth *v.* McGowan.

COMMONWEALTH *vs.* JOHN McGOWAN.

Hampden. October 1, 2012. - January 29, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Firearms. Constitutional Law,* Right to bear arms. *Statute,* Validity.

This court concluded that G. L. c. 140, § 131L (*a*), making it unlawful to store a firearm that is not carried by or under the immediate control of the owner or other authorized user unless the firearm is secured in a locked container or equipped with a safety device that renders the firearm inoperable by anyone other than the owner or other authorized user, falls outside the scope of the right to bear arms protected by the Second Amendment to the United States Constitution, given that the statute is consistent with the right to bear arms in self-defense in one's home and is designed to prevent those who are not licensed to possess or carry firearms from gaining access to firearms. [234-244]

COMPLAINTS received and sworn to in the Springfield Division of the District Court Department on November 18, 2008.

A motion to dismiss was heard by *Jacques C. Leroy*, J., and questions of law were reported to the Appeals Court by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John A. Rasmussen* for the defendant.

*Katherine Robertson*, Assistant District Attorney, for the Commonwealth.

GANTS, J. General Laws c. 140, § 131L (*a*), makes it unlawful to store a firearm that is not carried by or under the immediate control of the owner or other authorized user unless the firearm is secured in a locked container or equipped with a safety device that renders the firearm inoperable by anyone other than the owner or other authorized user. The issue presented by the reported questions is whether § 131L (*a*) is unconstitutional in light of the United States Supreme Court's decisions in *District of Columbia* v. *Heller*, 554 U.S. 570, 635 (2008) (*Heller*), which held that the Second Amendment to the United States Constitu-

tion guarantees an individual the right to keep and bear arms for self-defense in the home, and *McDonald* v. *Chicago*, 130 S. Ct. 3020, 3036, 3050 (2010) (*McDonald*), which incorporated the guarantees of the Second Amendment into the Fourteenth Amendment to the United States Constitution, making the Second Amendment applicable to the States. We conclude that, where § 131L (*a*) allows the owner of a firearm to carry or otherwise keep the firearm under the owner's immediate control within the home, and where the storage requirements are reasonably designed to prevent persons who are not licensed to possess or carry a firearm, including felons, the mentally ill, and children, from gaining illegal access to a firearm, § 131L (*a*) falls outside the scope of the right to bear arms protected by the Second Amendment.

*Background.* The parties stipulated to the following facts, which are contained in a stipulation and a police report dated October 19, 2008.[1] The defendant owned a Smith & Wesson forty caliber semiautomatic handgun, which he kept loaded and unlocked in a bedroom side table drawer on the second floor of his home. The defendant had a valid license to carry a firearm in Massachusetts, issued by the Springfield police department. On October 19, at approximately 5:42 P.M., officers were dispatched to the defendant's house in response to a telephone call he made about a domestic disturbance. When the police arrived, the defendant reported that he had an argument with his female "roommate" over a ten-dollar loan, and that his roommate became angry, went into the defendant's bedroom, retrieved his loaded handgun from the unlocked drawer, left the house, threw the firearm into the bushes beside the neighboring house, and locked the defendant out of the house when he left to retrieve the weapon. The officers secured the handgun, which was loaded with ten rounds, one in the chamber and the remainder in the magazine. The defendant told police that the firearm was loaded that way when the roommate took it.

The defendant was charged in a criminal complaint issued on November 18, 2008, in the Springfield Division of the District Court Department with a violation of § 131L (*a*). The defend-

---

[1]The parties also agreed to the submission of the defendant's United States Air Force service record, which reflects that he was honorably discharged from the Air Force, having attained the rank of captain.

ant moved to dismiss the complaint, claiming the statute is unconstitutional. Recognizing that the issues raised in the motion were "of immense constitutional depth and seriousness," the motion judge reported two questions to the Appeals Court:

> "1. Do the holdings in *Heller* and *McDonald,* under the circumstances of this motion, so conflict with the requirements of G. L. c. 140, § 131L (*a*), as to render the Massachusetts statute constitutionally unenforceable?

> "2. More broadly but quite specifically, with respect to rights protected by the Second Amendment . . . does Massachusetts still maintain authority to regulate for the protection of its citizens' health, safety and welfare to the extent that [§] 131L (*a*) could be enforced?"

See Mass. R. Crim. P. 34, as amended, 442 Mass. 1501 (2004). We transferred the case to this court on our own motion.

*Discussion.* In *Heller,* the United States Supreme Court held that the Second Amendment to the United States Constitution "protects the right to possess a handgun in the home for the purpose of self-defense."[2] *McDonald, supra* at 3050. *Heller, supra* at 635. *Heller* struck down the District of Columbia's "ban on handgun possession in the home" and its "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[3] *Id.* The Court declared that individual self-defense is the "*central component*" of the Second Amendment right and the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (emphasis

---

[2]The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

[3]The provision of the District of Columbia Code declared unconstitutional by the Court in *District of Columbia. v. Heller,* 504 U.S. 570 (2008), provided:

> "Except for law enforcement personnel described in § 7-2502.01(b)(1), each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia."

D.C. Code § 7-2507.02 (2008).

in original). *Id.* at 599, 635. Since *Heller*, "[c]ourts have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower* v. *Boston*, 693 F.3d 61, 72 (1st Cir. 2012), citing *United States* v. *Booker*, 644 F.3d 12, 25 n.17 (1st Cir. 2011), cert. denied, 132 S. Ct. 1538 (2012); *United States* v. *Greeno*, 679 F.3d 510, 517 (6th Cir.), cert. denied, 133 S. Ct. 375 (2012); *United States* v. *Staten*, 666 F.3d 154, 158 (4th Cir. 2011), cert. denied, 132 S. Ct. 1937 (2012); *United States* v. *Barton*, 633 F.3d 168, 170 (3d Cir. 2011); *United States* v. *Reese*, 627 F.3d 792, 800 (10th Cir. 2010), cert. denied, 131 S. Ct. 2476 (2011).

The Court in *Heller* acknowledged that its own precedents dictated that "the Second Amendment does not by its own force apply to anyone other than the Federal Government." *Heller, supra* at 619. See *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1875) (*Cruikshank*). See also *Commonwealth* v. *Runyan*, 456 Mass. 230, 233-234 (2010) (*Runyan*). Because *Heller* dealt with a District of Columbia ordinance, the Court did not reach the question whether to incorporate the newly confirmed Second Amendment right into the Fourteenth Amendment's due process clause. *Heller, supra* at 620 n.23.

After the *Heller* decision, but before the Supreme Court's decision in *McDonald*, we upheld the constitutionality of § 131L (a).[4] *Runyan, supra* at 237. We distinguished § 131L (a) from the District of Columbia regulation invalidated in *Heller* because § 131L (a) "does not require that firearms in the home be rendered and kept inoperable at all times" and "does not make it impossible for those persons licensed to possess firearms to rely on them for lawful self-defense." *Id.* at 236-237. However, we deferred to the Supreme Court's unwillingness in *Heller*

[4]General Laws c. 140, § 131L (a), states:

"It shall be unlawful to store or keep any firearm, rifle or shotgun including, but not limited to, large capacity weapons, or machine gun in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user. For purposes of this section, such weapon shall not be deemed stored or kept if carried by or under the control of the owner or other lawfully authorized user."

to overturn *Cruikshank. Id.* at 233-234. We determined that Runyan's Second Amendment challenge must fail because "the Second Amendment is not incorporated under the Fourteenth Amendment's guarantee of substantive due process and therefore does not apply to the States." *Id.* at 235. We did not decide whether Runyan's alleged violation of § 131L (*a*) could survive a motion to dismiss if the Second Amendment were made applicable to the States through incorporation under the Fourteenth Amendment's due process clause. *Id.* at 237 n.7.

In *McDonald*, five members of the Court determined that the individual right to keep and bear arms in self-defense is protected from infringement by the States. Four members of the Court agreed that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty" and concluded that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller." McDonald, supra* at 3042, 3050 (plurality opinion). Justice Thomas, while agreeing with the plurality result that the Fourteenth Amendment makes the right to keep and bear arms fully applicable to the States, did not concur that a clause speaking only of "process" could guarantee a substantive right. *Id.* at 3058-3059 (Thomas, J., concurring in part and concurring in the judgment). Instead, Justice Thomas concluded that the right to keep and bear arms is a "privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges and Immunities Clause." *Id.* at 3059 (Thomas, J., concurring in part and concurring in the judgment). Despite the absence of a majority as to the specific provision in the Fourteenth Amendment that makes the Second Amendment applicable to the States, it is clear from the *McDonald* decision that States cannot infringe on an individual's right to keep and bear arms in self-defense of the home.[5] Accordingly, we must now address the question left undecided in *Runyan*: whether

---

[5]The only consequential difference between the two approaches to incorporation in § 1 of the Fourteenth Amendment to the United States Constitution is that the privileges and immunities clause provides that States shall not abridge the "privileges or immunities of *citizens* of the United States," while the due process clause applies to "any person" (emphasis added). Neither party disputes that McGowan is a citizen of the United States. Thus, any distinction

enforcement of § 131L (*a*) constitutes impermissible State infringement on an individual's right to keep and bear arms for self-defense in the home.

While holding that the Second Amendment provides an individual right to keep and bear arms in self-defense in the home, the Supreme Court in *Heller* made clear that the Second Amendment right is "not unlimited." *Heller, supra* at 595. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. See *Mc-Donald, supra* at 3047. Accord *Commonwealth* v. *Gouse*, 461 Mass. 787, 801 (2012). The Court declared:

> "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Heller, supra* at 626-627. In a footnote, the Court added, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

The Supreme Court made clear that a law that infringes the right to bear arms in self-defense within the scope of the Second Amendment is subject to some level of heightened scrutiny, rejecting the notion that rational basis scrutiny would suffice. *Id.* at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect"). But it did not identify precisely what level of heightened scrutiny is appropriate because it concluded that the District of Columbia's

---

between the plurality's and Justice Thomas's approach to incorporation is immaterial where, as here, the defendant is both a person and a citizen of the United States.

outright ban on handguns would fail under any level of scrutiny. *Id.* at 628-629. See *Ezell* v. *Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) ("*Heller's* reference to 'any standard of scrutiny' means any *heightened* standard of scrutiny" [emphasis in original]). The Court rejected, however, Justice Breyer's proposal in his dissenting opinion that such laws be subject to an " 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Heller, supra* at 634, quoting *id.* at 689-690 (Breyer, J., dissenting). In rejecting the interest-balancing test, the Court drew an analogy to First Amendment freedom of speech:

> "The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest balancing by the people . . ." (emphasis in original).

*Heller, supra* at 635.

We appreciate that the "full significance of these pronouncements is far from self-evident." *United States* v. *Booker*, 644 F.3d 12, 23 (1st Cir. 2011). But we discern meaning from the Supreme Court's willingness to characterize some long-standing limitations on the right to bear arms, such as the prohibition of the possession of firearms by felons and the mentally ill, and the regulation of the commercial sale of arms, as "presumptively lawful" without subjecting these laws to heightened scrutiny, or identifying the level of heightened scrutiny that would apply. These laws could be presumptively lawful without such heightened scrutiny only if they fell outside the scope of the Second Amendment and therefore were not subject to heightened scrutiny. This conclusion is supported by the Supreme Court's analogy to the First Amendment right to freedom of speech, where it noted that obscenity, libel, and the disclosure of State secrets were excluded from the scope of the protection provided by this amendment through the "interest balancing" of those

that enacted the right. *Heller, supra* at 634-635. The inference we draw from the Supreme Court's analysis is that the "presumptively lawful" prohibitions and regulations do not burden conduct that falls within the scope of the Second Amendment and therefore are not subject to the heightened scrutiny required where protected conduct within the scope of the Second Amendment is infringed. See *Ezell* v. *Chicago, supra* at 702, quoting *United States* v. *Stevens,* 130 S. Ct. 1577, 1584 1585 (2010) ("The Supreme Court's free-speech jurisprudence contains a parallel for this kind of threshold 'scope' inquiry. The Court has long recognized that certain 'well-defined and narrowly limited classes of speech' e.g., obscenity, defamation, fraud, incitement are categorically 'outside the reach' of the First Amendment"). See generally Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1449-1453 (2009).

The inference we draw from *Heller* is shared by many of the circuit courts of the United States Court of Appeals that have concluded that " 'longstanding' regulations" are "presumed not to burden conduct within the scope of the Second Amendment." *Heller* v. *District of Columbia,* 670 F.3d 1244, 1253 (D.C. Cir. 2011). See *United States* v. *Marzzarella,* 614 F.3d 85, 91 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011) ("longstanding limitations are exceptions to the right to bear arms"). See also *United States* v. *Booker, supra* at 22-23; *United States* v. *Chester,* 628 F.3d 673, 679-680 (4th Cir. 2010); *United States* v. *Skoien,* 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011); *United States* v. *Rene E.,* 583 F.3d 8, 12 (1st Cir. 2009), cert. denied, 558 U.S. 1131 (2010).[6]

The "presumptively lawful" prohibitions and regulations that burden conduct outside the scope of the Second Amendment and therefore are not subject to heightened scrutiny under the Second Amendment are not limited to those that existed at the time of ratification in 1791. As the United States Court of Appeals for the First Circuit noted:

[6]"Though we always treat their decisions with deference, we are not bound by decisions of Federal courts except the decisions of the United States Supreme Court on questions of Federal law." *Commonwealth* v. *Montanez,* 388 Mass. 603, 604 (1983).

> "The felony firearm disqualification, which numbers among *Heller's* list of 'presumptively lawful' measures, presents a case in point. Though there may be some historical predicates for restricting the gun rights of those who have been convicted of a crime . . . the modern federal felony firearm disqualification law, 18 U.S.C. § 922(g)(1), is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified" (citations and footnote omitted).

*United States* v. *Booker, supra* at 23-24. See *National Rifle Ass'n of Am.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives,* 700 F.3d 185, 196 (5th Cir. 2012) (*"Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"); *United States* v. *Skoien, supra* at 641 ("exclusions need not mirror limits that were on the books in 1791"). Nonetheless, laws prohibiting certain classes of people from gaining access to firearms predate the enactment of the Second Amendment. See *United States* v. *Rene E., supra* at 15-16. For example, in the early days of the American Revolution, Massachusetts and Pennsylvania passed acts that disarmed anyone who refused to swear an oath of allegiance to the new nation. See St. 1776, c. 7; 1778 Pa. Laws c. 51, §§ 5, 6. In 1787, Massachusetts again limited access to firearms, this time by requiring individuals who participated in Shays' Rebellion to relinquish their arms for three years in order to obtain a pardon. See St. 1787, c. 6. See also Kates, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360 (2009) ("from time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms"); Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002) (during "Founding era," right to bear arms understood as "not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner").

We have consistently held, without applying any level of heightened scrutiny, that the decisions in *Heller* and *McDonald*

did not invalidate laws that require a person to have a firearm identification card to possess a firearm in one's home or place of business, and to have a license to carry in order to possess a firearm elsewhere. See *Commonwealth* v. *Johnson*, 461 Mass. 44, 58 (2011); *Commonwealth* v. *Loadholt*, 460 Mass. 723, 726 (2011); *Commonwealth* v. *Powell*, 459 Mass. 572, 589-590 (2011). Accord *People* v. *Perkins*, 62 A.D.3d 1160, 1161 (N.Y. 2009) (New York firearm licensing regulations do not violate Second Amendment). We are not alone. For example, in *Heller* v. *District of Columbia*, *supra* at 1254, the United States Court of Appeals for the District of Columbia Circuit held that "the basic requirement to register a handgun is longstanding in American law" and is presumptively lawful. Similarly, in *United States* v. *Rene E.*, *supra* at 15, the United States Court of Appeals for the First Circuit upheld a Federal statute prohibiting juveniles from possessing handguns because it was part of a "longstanding practice of prohibiting certain classes of individuals from possessing firearms — those whose possession poses a particular danger to the public." Contrast *Heller* v. *District of Columbia*, *supra* at 1255-1256 (applying heightened scrutiny to "novel" registration requirements); *United States* v. *Chester*, 628 F.3d 673, 681, 682 (4th Cir. 2010) (intermediate scrutiny appropriate because "we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors").

Nor did the decisions in *Heller* and *McDonald* invalidate laws that prevent the sale of firearms to persons who have no firearms identification card and therefore are not authorized to possess a firearm. The Supreme Court in *Heller* specifically recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are among the "presumptively lawful regulatory measures." *Heller*, *supra* at 626-627 & n.26. Laws that prohibit the sale of firearms to unauthorized users are similar in purpose to laws, such as § 131L (*a*), that require those authorized to possess a firearm, when they are not carrying or otherwise immediately controlling the firearm, to secure it to ensure that those who are not authorized to possess a firearm do not gain access to their firearm. Both types of laws are designed to keep firearms out of the hands of those not

authorized by law to possess a firearm, including but not limited to felons, the mentally ill, and children. See *Commonwealth* v. *Reyes, post* 245, 250-251 & n.5 (2012); *Jupin* v. *Kask*, 447 Mass. 141, 154 (2006) (§ 131L [a] "is illustrative of the societal concern with weapons reaching the hands of unauthorized users"); *Commonwealth* v. *Patterson*, 79 Mass. App. Ct. 316, 319 (2011) (purpose of § 131L [a] is "to guard against the use of firearms by unauthorized, incompetent, or irresponsible persons"). Without § 131L (a) or a comparable statute, those prohibited from purchasing a firearm may nonetheless gain ready access to an unsecured firearm that is not under the immediate control of the owner.[7]

Where a firearm is stored in the home, however, restrictions on the sale or storage of firearms must be consistent with the Second Amendment right of self-defense in the home. The provision of the District of Columbia Code at issue in *Heller*, D.C. Code § 7-2507.02 (2008), was not consistent with the right of self-defense in the home. As we noted in *Runyan, supra* at 236:

> "Under this provision, a person registered to keep a firearm (apart from law enforcement personnel) was prohibited in any circumstance from carrying or keeping a loaded firearm in his or her home. The ordinance prohibited a registered gun owner from keeping even an unloaded firearm in his or her home unless it was disassembled or rendered inoperable by a trigger lock or similar device."

In contrast, as we also noted, *id.*:

> "Under [G. L. c. 140, § 131L (a)], an individual with a valid firearms identification card issued under G. L. c. 140, § 129C, is not obliged to secure or render inoperable a firearm while the individual carries it or while it remains otherwise under the individual's control. A gun owner may therefore carry or keep a loaded firearm under his or her control in his or her home without securing it with a trig-

---

[7]The dangers posed when firearms are made accessible to unauthorized users cannot be understated. For example, in 2009, 800 children and teenagers in the United States committed suicide with a firearm, and firearm accidents killed an additional 114 children and teenagers. Children's Defense Fund, Protect Children Not Guns 38 (2012).

ger lock or comparable safety device. The gun owner's obligation to secure the firearm in accordance with the statute arises only when the firearm is stored or otherwise outside the owner's immediate control."

Therefore, unlike the provision declared unconstitutional in *Heller*, § 131L (*a*) is consistent with the right of self-defense in the home because it does not interfere with the ability of a licensed gun owner to carry or keep a loaded firearm under his immediate control for self-defense. See *Commonwealth* v. *Reyes*, *supra* at 257; *Commonwealth* v. *Patterson*, *supra* at 318 ("statute's storage requirement placed no meaningful restraint on the defendant's ability to use the gun in lawful self-defense if for no other reason than that he himself placed it where it could not be quickly reached"); Jackson *vs*. City & County of San Francisco, U.S. Dist. Ct., No. C 09-2143 RS, slip op. at 4 (N.D. Cal. Aug. 17, 2012), quoting *Heller*, *supra* at 576 (regulation that allows residents to carry unsecured firearms freely in their homes, but requires them to apply trigger locks or to store handguns in locked containers when the guns are not under direct, personal control, "permits individuals the very right the plaintiff in *Heller* was seeking: 'to render a firearm operable and carry it about his home in that condition' ").

Even though the obligation to secure a firearm in § 131L (*a*) applies only where the gun owner chooses not to carry a firearm or keep it under his immediate control, the defendant suggests that the brief period of delay needed to unlock a secure storage container or trigger lock suffices to render this requirement in violation of the Second Amendment's right to self-defense in one's home. We disagree. The Supreme Court in *Heller* specifically noted that its analysis did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Heller, supra* at 632. The prevention of accidents by those not authorized to use firearms, as well as the prevention of crimes of violence and suicide by those not authorized to possess firearms, are among the evils that § 131L (*a*) is intended to prevent. See *Commonwealth* v. *Reyes, supra* at 250-251 & n.6. Any law regulating the storage of firearms will delay to some degree the ability of a firearm owner to retrieve and fire the firearm in self-defense. If such a brief period of delay were sufficient to render the law unconstitutional, the Supreme Court in

*Heller* would not have declared that its analysis did not suggest the invalidity of firearm storage laws.[8]

We hold that, because § 131L (*a*) is consistent with the right to bear arms in self-defense in one's home and is designed to prevent those who are not licensed to possess or carry firearms from gaining access to firearms, it falls outside the scope of the Second Amendment. As a result, it is subject only to rational basis analysis, which it easily survives. Therefore, we conclude that § 131L (*a*) is constitutional under the Supreme Court's holdings and analysis in *Heller* and *McDonald*, and that Massachusetts may enforce § 131L (*a*) to protect the health, safety, and welfare of its citizens.[9]

*Conclusion.* We answer, "No," to the first reported question, and, "Yes," to the second reported question. The case is remanded to the District Court for further proceedings consistent with this decision.

*So ordered.*

---

[8]We also note, as we did in *Commonwealth* v. *Runyan*, 456 Mass. 230, 237 n.8 (2010), that "even if a firearm were secured in the manner required by G. L. c. 140, § 131L (*a*), a gun owner threatened in his or her home today would be able to fire the weapon in self-defense at least as quickly as would a gun owner in 1791, when the Second Amendment was adopted. At that time, laws were in effect requiring that gunpowder be stored separately from firearms, which meant that a law-abiding homeowner acting in self-defense would need time to load and fire a musket or flintlock pistol. See [*District of Columbia* v. *Heller*, 554 U.S. 570, 684-686 (2008)] (Breyer, J., dissenting). A skilled soldier of that time using specially prepared cartridges required a minimum of fifteen to twenty seconds to load and fire a musket; a less skilled soldier could fire no more quickly than once per minute. Hicks, United States Military Shoulder Arms, 1795-1935, 1 Am. Military Hist. Found. 23, 30-31 (1937). A gun owner today could remove a firearm from a locked container or release a trigger lock more quickly than that."

[9]Because we conclude that § 131L (*a*) falls outside the scope of the Second Amendment, we need not delve into the unsettled waters surrounding the level of heightened scrutiny applicable to statutes within its scope that infringe on the right to bear arms in self-defense in the home. See *Ashwander* v. *Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring), quoting *Burton* v. *United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case"). Declining to address this issue is particularly appropriate in a case, such as this, where neither party briefed the question. See *Roberts* v. *Enterprise Rent-A-Car Co. of Boston, Inc.*, 438 Mass. 187, 188 n.4 (2002).