MIRKO CHARDIN *vs.* POLICE COMMISSIONER OF BOSTON
& another.[1]

Suffolk. February 4, 2013. - June 4, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Firearms. License. Constitutional Law,* Right to bear arms. *Delinquent Child.*

Discussion of the statutory scheme governing licensing of firearms. [315-317]

Discussion of the case law interpreting the right to keep and bear arms under the Second Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment to the United States Constitution. [321-325]

This court concluded that G. L. c. 140, § 131 (*d*) (i), which precludes a person from ever obtaining a license to carry firearms if he or she has been adjudicated a delinquent child for the commission of a felony, did not infringe on the plaintiff's right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, where the statute does not burden conduct that falls within the scope of the Second Amendment. [325-329]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 13, 2011.

The case was reported by *Spina,* J.

*Edward F. George, Jr.,* for the plaintiff.

*Keith G. Langer* for Commonwealth Second Amendment, Inc., amicus curiae.

*William W. Porter,* Assistant Attorney General, for the intervener.

*Amanda E. Wall,* for the defendant, was present but did not argue.

SPINA, J. In this case, here on a reservation and report by a single justice of this court, we consider whether the Massachusetts firearms licensing statute, G. L. c. 140, § 131 (*d*) (i), infringes on Mirko Chardin's right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution

---

[1]The Commonwealth, intervener.

because it precludes him from ever obtaining a license to carry firearms where, in 1995, he was adjudicated a delinquent child[2] after admitting to sufficient facts on a complaint charging him with one count of possession of a firearm without a license, and one count of unlawful possession of ammunition. We conclude that, consistent with the United States Supreme Court's decisions in *District of Columbia* v. *Heller,* 554 U.S. 570 (2008) (*Heller*), and *McDonald* v. *Chicago,* 130 S. Ct. 3020 (2010) (*McDonald*), the challenged statute does not infringe on a right protected by the Second Amendment.[3]

1. *Statutory scheme.* An individual who lawfully wants to carry a firearm[4] within the Commonwealth either must obtain a license to do so pursuant to G. L. c. 140, § 131, or be exempt from the statutory licensing requirements.[5] See, e.g., G. L. c. 140, §§ 129C, 131F, 131G. See also *Commonwealth* v. *Seay,* 376 Mass. 735, 739 (1978). "The historical aim of licensure generally is preservation of public health, safety, and welfare by extending the public trust only to those with proven qualifications." *Leduc* v. *Commonwealth,* 421 Mass. 433, 435 (1995), cert. denied, 519 U.S. 827 (1996). In Massachusetts, there are two categories of licenses to carry firearms — Class A and

[2]A "delinquent child" is "a child between seven and seventeen who violates any city ordinance or town by-law or who commits any offence against a law of the commonwealth." G. L. c. 119, § 52. General Laws c. 119, §§ 52-63, govern proceedings involving delinquent children.

[3]We acknowledge the amicus brief filed by Commonwealth Second Amendment, Inc., in support of Chardin.

[4]The term "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." G. L. c. 140, § 121.

[5]Separate and distinct from a license to carry firearms is a firearm identification (FID) card. See G. L. c. 140, § 129B; *Commonwealth* v. *Gouse,* 461 Mass. 787, 799-800 n.14 (2012). General Laws c. 269, § 10 (*h*) (1), makes it an offense to own or possess a firearm in one's home or place of business without obtaining an FID card pursuant to G. L. c. 140, § 129C. See *Commonwealth* v. *Powell,* 459 Mass. 572, 587 (2011), cert. denied, 132 S. Ct. 1739 (2012). Although an FID card allows its holder to own or possess a firearm within the holder's residence or place of business, it does not allow the holder to carry the firearm to or in any other place. See *id.* See also G. L. c. 140, § 129C (*u*) ("The possession of [an FID card] shall not entitle any person to carry a firearm in violation of [G. L. c. 269, § 10]").

Class B. See G. L. c. 140, § 131 (*a*) & (*b*). Each type of license may be issued by a "licensing authority," defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them," G. L. c. 140, § 121, or by the colonel of the State police, G. L. c. 140, § 131 (*d*). The Class A license, which is the focus of this case, authorizes the holder to possess and carry "firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper."[6] G. L. c. 140, § 131 (*a*). In the absence of a restriction, G. L. c. 140, § 131 (*a*), does not prohibit the possession or carrying of a concealed firearm in public. See *Hightower* v. *Boston*, 693 F.3d 61, 66 (1st Cir. 2012). Contrast G. L. c. 140, § 131 (*b*) (precluding holder of Class B license from possessing or carrying loaded firearm "in a concealed manner in any public way or place").

The licensing authority or colonel of the State police may issue a Class A license to carry firearms "if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason." G. L. c. 140, § 131 (*d*). The "suitable person" standard gives the licensing authority or colonel "considerable latitude" or broad discretion in making a licensing decision. *Ruggiero* v. *Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 259 (1984). See *Howard* v. *Chief of Police of Wakefield*, 59 Mass. App. Ct. 901, 902 (2003). However, an applicant is statutorily disqualified from obtaining a license to carry firearms if, among other reasons, the applicant "has, in

---

[6]The Class A license also authorizes the holder to possess and carry "rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper." G. L. c. 140, § 131 (*a*). Massachusetts law defines a "large capacity weapon" as any firearm, rifle, or shotgun that is semiautomatic and has a fixed large capacity feeding device or can be readily modified to accept such a device, or that "employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm," or that is defined under Federal law as an assault weapon. G. L. c. 140, § 121.

any state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (*a*) a felony . . . ."[7] G. L. c. 140, § 131 (*d*) (i).

Within forty days from the date of the application, the licensing authority shall "either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing." G. L. c. 140, § 131 (*e*). If an application is denied, the aggrieved party may file, within ninety days after receiving notice, "a petition to obtain judicial review in the district court having jurisdiction in the city or town" where the application was filed. G. L. c. 140, § 131 (*f*). A judge, after an evidentiary hearing, may direct that a license be issued to the petitioner if the judge finds that there was "no reasonable ground" for denying such license, and that the petitioner "is not prohibited by law from possessing [the] same." *Id*. See *Godfrey* v. *Chief of Police of Wellesley*, 35 Mass. App. Ct. 42, 44-45 (1993). The petitioner is entitled to relief only if the licensing authority's denial was "arbitrary, capricious, or an abuse of discretion." *Id*. at 46, quoting *Chief of Police of Shelburne* v. *Moyer*, 16 Mass. App. Ct. 543, 546 (1983). Further judicial review is available to the petitioner by way of an action in the nature of certiorari. See G. L. c. 249, § 4. See also *Levine* v. *Chief Justice of the Dist. Court Dep't of the Trial Court*, 434 Mass. 1014, 1014 (2001); *Godfrey* v. *Chief of Police of Wellesley, supra*.

---

[7]An applicant also is statutorily disqualified from obtaining a license to carry firearms by virtue of a conviction or adjudication as a youthful offender or delinquent child for the commission of (1) "a misdemeanor punishable by imprisonment for more than two years"; (2) "a violent crime as defined in [G. L. c. 140, § 121]"; (3) a violation of any law regulating the possession of weapons or ammunition "for which a term of imprisonment may be imposed"; or (4) "a violation of any law regulating the use, possession or sale of controlled substances as defined in [G. L. c. 94C, § 1]." G. L. c. 140, § 131 (*d*) (i). In addition, an applicant similarly is disqualified for (1) mental illness; (2) alcohol or drug addiction; (3) being less than twenty-one years old at the time of the application; (4) being an alien; (5) being the subject of a restraining order issued pursuant to G. L. c. 209A; or (6) being the subject of an outstanding arrest warrant. See G. L. c. 140, § 131 (*d*) (ii)-(vii). Contrast *Fletcher* v. *Haas*, 851 F. Supp. 2d 287, 288, 301-303 (D. Mass. 2012) (Massachusetts firearms regulatory scheme, as applied to two aliens maintaining lawful permanent residency in United States, impermissibly encroaches on Second Amendment rights).

2. *Factual and procedural history.* The essential facts are not disputed. In early 1995, when Chardin was fourteen years old, one of his best friends was shot and killed for the pair of sneakers that the friend had been wearing. Fearing for his personal safety, Chardin obtained a handgun for his own protection. He never used it to commit a crime or threaten anyone. On January 18, 1995, while Chardin was standing in front of a plain-clothed police officer, the handgun fell from the pocket of his pants onto the ground. Chardin was arrested and taken into custody.

On January 19, 1995, he was charged in the Juvenile Court with one count of possession of a firearm without a license, and one count of unlawful possession of ammunition.[8] On April 18, 1995, Chardin admitted to sufficient facts and was adjudicated a delinquent child with respect to both charges. He received a suspended commitment to the Department of Youth Services, was released to his mother's custody, and was given probation until April 18, 1996.

In the years since this incident, Chardin has been a law-abiding citizen. He graduated from college, earned a master's degree in teaching, has been working toward a Ph.D. in education, became an ordained minister, and has done volunteer work in his community. Chardin currently is employed as the head of the Putnam Avenue Upper School in Cambridge. He also is a coowner and manager of a small used car dealership in the Roslindale area of Boston, JBI Auto Sales LLC (JBI). He works there part-time, at night and on the weekends, and he regularly attends car auctions to buy vehicles for JBI. At these auctions, purchases must be made in cash, so Chardin is required to carry

---

[8]The Juvenile Court docket does not set forth the specific statutory provisions that Chardin was alleged to have violated. Nonetheless, with respect to the firearm offense, the docket indicates that the charge was possession of a firearm without a license. This reading of the docket is consistent with testimony given by Chardin at an evidentiary hearing on March 15, 2011; testimony given at the same hearing by Lieutenant Mark Harrington of the Boston police department, who reviewed Chardin's application for a license to carry firearms; and the parties' stipulation of the facts dated March 15, 2012. As discussed *infra*, in 1995, possession of a firearm without a *license* was an offense under G. L. c. 269, § 10 (*a*). See St. 1990, c. 511, § 2. In contrast, G. L. c. 269, § 10 (*h*), prohibited the possession of a firearm "without complying with the requirements relating to the *firearm identification card*" as set forth in G. L. c. 140, § 129C (emphasis added). St. 1990, c. 511, § 3.

large amounts of money on his person, which has caused him to fear for his safety. In addition, JBI has a night deposit agreement with Citizens Bank whereby Chardin regularly makes large cash deposits for JBI, again raising personal safety concerns.

On April 26, 2010, Chardin submitted to the Boston police department an application for an unrestricted Class A license to carry firearms, which he stated that he was requesting for "all lawful purpose[s]," together with a fee of $100.[9] On an attached worksheet, Chardin responded more specifically to a question about why he required such a license by stating that it was for "club use"[10] and for "protection as a used car dealer who is required to make large cash purchases/transactions." By letter dated July 26, 2010, the police commissioner, who is the licensing authority for the city of Boston under G. L. c. 140, §§ 121 and 131, denied the application, stating: "[Y]ou have a sealed record with a disqualifying conviction(s) as outlined in chapter 180 of the Acts of 1998."

On October 15, 2010, Chardin filed a complaint for judicial review in the Boston Municipal Court pursuant to G. L. c. 140, § 131 (*f*).[11] He stated that he was seeking a Class A license to carry firearms "due to the dangers involved in his used car dealership business." In Count I of his complaint, Chardin alleged that the denial of his application was based on an error of law in that he did not have any convictions or adjudications on his juvenile record that would disqualify him under G. L. c. 140, § 131 (*d*) (i), from obtaining a license because the charges on his record ultimately were dismissed. In Count II, Chardin alleged that the denial of his application was a mistake due to the absence of disqualifying factors. Finally, in Count III of his complaint, Chardin alleged that if his juvenile charges were deemed to be automatic disqualifiers under G. L. c. 140, § 131 (*d*) (i), then the statute, as applied to Chardin, was unconstitutional because it

[9]Chardin did not apply for an FID card.

[10]In February, 2010, Chardin became a member of the Boston Gun & Rifle Association, Inc.

[11]On March 22, 2010, Chardin's juvenile record had been sealed pursuant to G. L. c. 276, § 100B. Chardin subsequently asked that his record be unsealed so that he could challenge the denial of his application for a license to carry firearms. On September 23, 2010, a Juvenile Court judge ordered that Chardin's juvenile record be unsealed.

violated his fundamental right to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution pursuant to *Heller*, 554 U.S. at 635, and *McDonald*, 130 S. Ct. at 3050.[12]

An evidentiary hearing was held on March 15, 2011. Although the judge agreed with the police commissioner that the only issue before her was the applicability of G. L. c. 140, § 131 (*d*) (i), to Chardin's circumstances, she allowed Chardin to testify regarding his suitability for a license.[13] Chardin described the events leading up to his adjudication as a delinquent child, and the path his life had taken since that time. Among other things, he stated that he only would use a firearm in circumstances where he or a family member was in danger, and he responded "[y]es" when his attorney asked whether that would include "at the auctions or at home." Testimony also was presented from Lieutenant Mark Harrington of the Boston police department who, on behalf of the police commissioner, had reviewed Chardin's application. He stated that once he received notice of Chardin's statutory disqualification, due to his adjudication as a delinquent child for possession of a firearm without a license, he did not go any further in the application process. On March 30, 2011, the judge found that Chardin was "statutorily disqualified from possessing

[12]When Chardin submitted his application for a license and his subsequent complaint for judicial review, he was operating under the mistaken belief that the charges on his juvenile record had been dismissed, and that he never was adjudicated a delinquent child, because of a notation "Dismissed" on his record. At some point, Chardin's counsel filed in the Juvenile Court a request for clarification of his client's juvenile record. In response, a judge explained that, in fact, Chardin had been adjudicated a delinquent child, and that the notation on his record should have read "TERM," as it referred to the disposition of his probation, not the charges. The record was corrected on February 25, 2011, to reflect that Chardin's probation was terminated on April 18, 1996. Chardin has accepted this interpretation, and he now seeks review only of the constitutional claim presented in Count III of his complaint.

[13]Counsel for the police commissioner had objected to the introduction of Chardin's testimony on the ground that it was irrelevant to his complaint for judicial review where he statutorily was disqualified from obtaining a license to carry firearms. Counsel argued that Chardin had failed to show that the commissioner had acted in an arbitrary or capricious manner where the commissioner had no discretion to issue a license given the plain language of G. L. c. 140, § 131 (*d*) (i). Moreover, counsel continued, it was not the purview of the commissioner to defend the constitutionality of the statute; it simply was his job to enforce it.

a license to carry a firearm."[14] The following day, the judge entered a judgment of dismissal in favor of the police commissioner.

On April 8, 2011, Chardin filed a notice of appeal in the Boston Municipal Court. Six months later, he filed an action in the nature of certiorari, pursuant to G. L. c. 249, § 4, in the Supreme Judicial Court for Suffolk County. He alleged that G. L. c. 140, § 131 (d) (i), as applied to his circumstances, violated his right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution. The Attorney General, on behalf of the Commonwealth, was allowed to intervene to defend the constitutionality of the statute. On April 6, 2012, the single justice reserved and reported the case for decision by the full court.[15]

3. *Constitutional framework.* The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." To determine whether G. L. c. 140, § 131 (d) (i), impermissibly burdens Chardin's Second Amendment right, we begin with *Heller.* In that case, the United States Supreme Court considered whether "a District of Columbia prohibition on the possession of usable handguns in the home" violated the Second Amendment. *Heller, supra* at 573. Based on textual and historical analyses, the Court concluded that the Second Amendment guarantees an individual right to keep and bear firearms in one's home for the purpose of self-defense.[16] See *id.* at 635.

---

[14]The judge did not make any findings regarding Chardin's suitability for a license, and she did not address his Second Amendment claim.

[15]General Laws c. 249, § 4, provides for limited judicial review in the nature of certiorari to correct errors of law in administrative proceedings where judicial review is otherwise unavailable. See *Sheriff of Plymouth County v. Plymouth County Personnel Bd.,* 440 Mass. 708, 710 (2004); *Carney* v. *Springfield,* 403 Mass. 604, 605 (1988). Certiorari allows a court to "correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff. . . . In its review, the court may rectify only those errors of law which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public." *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth,* 430 Mass. 783, 790 (2000), quoting *Carney* v. *Springfield, supra.* See *State Bd. of Retirement* v. *Bulger,* 446 Mass. 169, 173 (2006).

[16]In *District of Columbia* v. *Heller,* 554 U.S. 570, 630, 635 (2008) (*Heller*),

The Court opined that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."[17] *Id.* Since *Heller,* "[c]ourts have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower* v. *Boston,* 693 F.3d 61, 72 (1st Cir. 2012), citing *United States* v. *Booker,* 644 F.3d 12, 25 n.17 (1st Cir. 2011), cert. denied, 132 S. Ct. 1538 (2012). See *Commonwealth* v. *McGowan,* 464 Mass. 232, 235 (2013) (*McGowan*), and cases cited. Two years after its decision in *Heller,* a plurality of the Supreme Court held in *McDonald, supra,* that an individual's Second Amendment right was fully applicable to the States through the Fourteenth Amendment to the United States Constitution.

Notwithstanding its articulation in *Heller* of an individual right to keep and bear arms in one's home for self-defense, the Supreme Court also recognized that the Second Amendment right is "not unlimited, just as the First Amendment's right of free speech . . . [does not] protect the right of citizens to speak for *any purpose*" (emphasis in original). *Heller, supra* at 595. It

the Supreme Court also held that a District of Columbia law that required gun owners to secure their weapons with a trigger lock or keep them unloaded and disassembled violated the Second Amendment because it rendered such firearms inoperable for the purpose of immediate self-defense in the home. Unlike the law declared unconstitutional in *Heller,* we have upheld the constitutionality of G. L. c. 140, § 131L (*a*), which makes it unlawful to store a firearm that is not carried by or under the immediate control of the owner or other lawfully authorized user unless such weapon is secured in a locked container or equipped with a safety device that renders it inoperable by anyone other than the owner or other lawfully authorized user. See *Commonwealth* v. *McGowan,* 464 Mass. 232, 244 (2013) (*McGowan*). We have concluded that, in contrast to the District of Columbia law, § 131L (*a*) "is consistent with the right of self-defense in the home because it does not interfere with the ability of a licensed gun owner to carry or keep a loaded firearm under his immediate control for self-defense." *Id.* at 243.

[17] In *Heller, supra* at 635, the Supreme Court also stated, "[a]ssuming that Heller *is not disqualified* from the exercise of Second Amendment rights, the District [of Columbia] must permit him to register his handgun and must issue him a license to carry it in the home" (emphasis added). This pronouncement suggests that the initial inquiry to be made when evaluating a right to bear arms is not whether the handgun is necessary for self-defense in the home, but whether an individual is *qualified* to possess a firearm in the first instance.

pointed out that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. As such, the Court continued, an individual's Second Amendment right does not prohibit laws regulating who may purchase, possess, and carry firearms, and where such weapons may be carried. See *id.* at 626-627. Although the Supreme Court did not undertake "an exhaustive historical analysis" of the full scope of the Second Amendment, it identified an expressly nonexclusive list of "presumptively lawful regulatory measures," declaring that nothing in *Heller* "should be taken to cast doubt on long-standing prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[18] *Id.* at 626-627 & n.26. Notably, the Court reiterated in *McDonald* its recognition of these permissible limitations when it stated that the Fourteenth Amendment's incorporation of Second Amendment rights "does not imperil every law regulating firearms." *McDonald, supra* at 3047.

With regard to the regulation of firearms, the Supreme Court made clear in *Heller* that "a law that infringes the right to bear arms in self-defense within the scope of the Second Amendment is subject to some level of heightened scrutiny, rejecting the notion that rational basis scrutiny would suffice." *McGowan, supra* at 237. See *Heller, supra* at 628 n.27. However, the Court declined to "identify precisely what level of heightened scrutiny is appropriate because it concluded that the District of

---

[18]In *Heller,* the Supreme Court drew no distinction between violent and nonviolent felonies. See *Heller, supra* at 626-627. We note that the Federal ban on felons in possession of firearms, 18 U.S.C. § 922(g)(1) (2006), "does not distinguish between the violent and non-violent offender," *United States* v. *White,* 593 F.3d 1199, 1205-1206 (11th Cir. 2010), and consistently has withstood Second Amendment challenges. See *United States* v. *Torres Rosario,* 658 F.3d 110, 113 & n.1 (1st Cir. 2011), cert. denied, 132 S. Ct. 1766 (2012), and cases cited. Cf. *United States* v. *Everist,* 368 F.3d 517, 519 (5th Cir. 2004) (acknowledging pre-*Heller* that "[i]rrespective of whether [the] offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens").

Columbia's outright ban on handguns would fail under any level of scrutiny." *McGowan, supra* at 237-238. See *Heller, supra* at 628-629. Nonetheless, we have "discern[ed] meaning from the Supreme Court's willingness to characterize some long-standing limitations on the right to bear arms, such as the prohibition of the possession of firearms by felons and the mentally ill, . . . as 'presumptively lawful' without subjecting these laws to heightened scrutiny, or identifying the level of heightened scrutiny that would apply. These laws could be presumptively lawful without such heightened scrutiny only if they fell outside the scope of the Second Amendment and therefore were not subject to heightened scrutiny."[19] *McGowan, supra* at 238, quoting *Heller, supra* at 627 n.26. See *United States* v. *Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011) ("presumptively lawful" language in *Heller* intended to put certain recognized prohibitions outside ambit of Second Amendment right delineated in *Heller*). In other words, long-standing and "presumptively lawful" regulations on the right to keep and bear arms "do not burden conduct that falls within the scope of the Second Amendment and therefore are not subject to the heightened scrutiny required where protected conduct within the scope of the Second Amendment is infringed."[20] *McGowan, supra* at 239. See, e.g., *United States* v. *Booker, supra* at 23-24 (felony firearm disqualification is

---

[19]Consistent with this analysis, in *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011), the United States Court of Appeals for the Third Circuit read *Heller* as suggesting a two-pronged approach to Second Amendment challenges. "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.* See *National Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194, 197-198 (5th Cir. 2012), and cases cited (describing two-pronged inquiry as prevailing approach among Federal Courts of Appeals, and recognizing that analytical framework comports both with language of *Heller* and with analogous First Amendment jurisprudence).

[20]We pointed out in *McGowan, supra* at 239, that " 'presumptively lawful' prohibitions and regulations that burden conduct outside the scope of the Second Amendment . . . are not limited to those that existed at the time of ratification in 1791." See *National Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives, supra* at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a

presumptively lawful and only burdens conduct outside scope of Second Amendment); *United States* v. *Marzzarella, supra* (long-standing firearms prohibitions, such as possession by felons and mentally ill persons, are exceptions to right to bear arms); *United States* v. *Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009), cert. denied, 558 U.S. 1131 (2010) (Federal statute barring juveniles from possessing handguns, with limited exceptions, consistent with long-standing practice of prohibiting certain classes of individuals from possessing firearms and not offensive to Second Amendment right). Contrast *United States* v. *Chester*, 628 F.3d 673, 681, 683 (4th Cir. 2010) (intermediate scrutiny of Federal firearms prohibition appropriate because court "not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors").

4. *Discussion.* In 1995, when Chardin was adjudicated a delinquent child for possession of a firearm without a license, see note 8, *supra*, G. L. c. 269, § 10 (*a*), provided that such an offense was punishable by "imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than one year nor more than two and one-half years in a jail or house of correction." St. 1990, c. 511, § 2. A crime punishable by imprisonment in the State prison is a felony. See G. L. c. 274, § 1. Therefore, possession of a firearm without a license was (and still is) a felony in Massachusetts.[21] See *Yanovitch* v. *United States*, 985 F. Supp. 17, 21 (D. Mass. 1997). That Chardin could not be sentenced to the State prison, see *Commonwealth* v. *Connor C.*, 432 Mass. 635, 641 (2000), does not change the nature of his offense, even though an "adjudication" of delinquency generally is not a "conviction" of a crime.

---

precise founding-era analogue"); *United States* v. *Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011) ("exclusions need not mirror limits that were on the books in 1791").

[21] In 1995, Chardin also admitted to sufficient facts on a complaint charging him with one count of unlawful possession of ammunition. General Laws c. 269, § 10 (*h*), provided that possession of ammunition without complying with the requirements relating to the FID card, as set forth in G. L. c. 140, § 129C, "shall be punished by imprisonment in a jail or house of correction for not more than one year or by a fine of not more than five hundred dollars." St. 1990, c. 511, § 3. The unlawful possession of ammunition constituted a misdemeanor. See G. L. c. 274, § 1.

*Id.* at 646 (expressly adhering to long-standing jurisprudence governing delinquent children, notwithstanding narrow holding that adjudication of delinquency for possession of firearm without license constitutes prior "conviction" under second offense penalty provision of G. L. c. 269, § 10 [*d*]). See *Department of Youth Servs.* v. *A Juvenile*, 384 Mass. 784, 786 (1981). In other words, although the juvenile justice system did not treat Chardin as a "criminal" for his possession of a firearm without a license, as evidenced by the disposition of the charges against him, he nonetheless committed an unlawful act that was a felony. See *Stokes* v. *Commonwealth*, 368 Mass. 754, 772 (1975) (act committed by juvenile against laws of Commonwealth is criminal act).

It has been a "long-standing principle" in Massachusetts that "the treatment of children who offend our laws are not criminal proceedings." *Commonwealth* v. *Connor C.*, *supra* at 641. See *Commonwealth* v. *Anderson*, 461 Mass. 616, 629-630, cert. denied, 133 S. Ct. 433 (2012); *Department of Youth Servs.* v. *A Juvenile*, *supra*. General Laws c. 119, § 53, sets forth a legislative policy that statutory provisions dealing with delinquent children shall be construed liberally such that children brought before court, "as far as practicable, . . . shall be treated, not as criminals, but as children in need of aid, encouragement and guidance."[22] See *Commonwealth* v. *Magnus M.*, 461 Mass. 459,

---

[22] In 1996, the Legislature enacted substantial changes to the law governing delinquent children, focused primarily on those children who commit violent offenses or unlawful acts using firearms. See St. 1996, c. 200. See also *Commonwealth* v. *Connor C.*, 432 Mass. 635, 637-638 (2000); R.L. Ireland, Juvenile Law § 1.1, at 12-13 (2d ed. 2006). General Laws c. 119, § 54, now provides that a juvenile may be indicted as a "youthful offender" if he is between the ages of fourteen and seventeen years and is accused of an offense that, if he were an adult, would be punishable by imprisonment in State prison, and has either previously been committed to the Department of Youth Services or has committed an offense that involves the infliction or threat of serious bodily harm or a violation of a firearm offense set forth in G. L. c. 269, § 10 (*a*), (*c*), or (*d*), or § 10E. See G. L. c. 119, § 52. "[A]n adjudication of a juvenile as a youthful offender subjects him to more severe penalties, including State prison sentences, see G. L. c. 119, § 58, but it does not transform his illegal act from an act of delinquency into a crime, and does not change the statutory obligation to treat him 'as far as practicable' as a child 'in need of aid, encouragement and guidance' rather than as a criminal. G. L. c. 119, § 53." *Commonwealth* v. *Anderson*, 461 Mass. 616, 630, cert. denied, 133 S. Ct. 433 (2012). See generally R.L. Ireland, Juvenile Law, *supra* at § 1.2, at 16-18.

461, 466 (2012) (discussing underlying philosophy and goals of juvenile justice system); R.L. Ireland, Juvenile Law § 1.3, at 18-32 (2d ed. 2006) (same). This statutory provision has remained unchanged since the chapter's original enactment in 1906, see St. 1906, c. 413, § 2, entitled "An Act relative to delinquent children." Significantly, G. L. c. 119, § 53, was firmly in place when the Legislature enacted G. L. c. 140, § 131 (*d*) (i). See St. 1998, c. 180, § 41. Given that the "Legislature is presumed to be aware of existing statutes when it . . . enacts a new one," *Paquette* v. *Commonwealth*, 440 Mass. 121, 130 (2003), cert. denied, 540 U.S. 1150 (2004), we conclude that the Legislature intended to preclude an individual who has been adjudicated a delinquent child for the commission of a felony from obtaining a license to carry firearms, notwithstanding the policy enunciated in G. L. c. 119, § 53. If the Legislature had wanted to exclude this class of persons from the provisions of G. L. c. 140, § 131 (*d*) (i), it would not have expressly disqualified such persons from licensure.

Given that the Legislature has determined, as is its purview, that an adjudication as a delinquent child for the commission of a felony is a categorical bar to obtaining a license to carry firearms, the question becomes whether G. L. c. 140, § 131 (*d*) (i), infringes on Chardin's Second Amendment right to keep and bear arms as articulated in *Heller, supra* at 635, and *McDonald, supra* at 3050. In conformity with our discussion of the constitutional framework of this case, we conclude that § 131 (*d*) (i) does not burden conduct that falls within the scope of the Second Amendment. To the contrary, the statute embodies a long-standing and well-recognized prohibition on the possession of firearms by a particular group of individuals — those who have committed a felony — and is clearly encompassed within the "presumptively lawful regulatory measures" that *Heller* has declared to be outside the ambit of the Second Amendment. See *Heller, supra* at 626-627 & n.26. Accordingly, we conclude that G. L. c. 140, § 131 (*d*) (i), passes constitutional muster. Chardin's challenge to the statute is unavailing, and the Commonwealth may continue to enforce its provisions to protect the health, safety, and welfare of its citizens.

Our interpretation of G. L. c. 140, § 131 (*d*) (i), does not run

afoul of recent Supreme Court jurisprudence recognizing the reduced culpability of juveniles as compared to adults and declaring unconstitutional the imposition of the harshest criminal penalties on juvenile offenders. First, in *Roper* v. *Simmons*, 543 U.S. 551, 564, 569-570, 578-579 (2005), the Court held that, in light of a "national consensus against the death penalty for juveniles" and the general immaturity and vulnerability of those under eighteen years of age, imposition of the death penalty on offenders who were under that age when they committed their crimes is contrary to the prohibition on cruel and unusual punishment in the Eighth Amendment to the United States Constitution. Next, in *Graham* v. *Florida*, 130 S. Ct. 2011, 2030 (2010), the Court held that the Eighth Amendment prohibits the imposition of a sentence of life in prison without the possibility of parole on a juvenile offender who does not commit the crime of homicide. The Court stated that such a "categorical rule gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform." *Id.* at 2032. Most recently, in *Miller* v. *Alabama*, 132 S. Ct. 2455, 2469 (2012), the Court concluded that sentencing a juvenile to mandatory life imprisonment without the possibility of parole (as required for a conviction of murder in the first degree) similarly violates the Eighth Amendment prohibition on cruel and unusual punishment. That decision reaffirmed the "diminished culpability and greater prospects for reform" of juvenile offenders. *Id.* at 2464.

These cases highlighted the draconian consequences flowing from the imposition of the most severe criminal penalties on juvenile offenders who, because of their age and immaturity, are deemed to have lesser culpability than their adult counterparts. As the Supreme Court stated in *Miller* v. *Alabama*, *supra* at 2463, quoting *Roper* v. *Simmons*, *supra* at 560, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions'. . . . That right . . . 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense." The Court's Eighth Amendment jurisprudence "make[s] clear that the prohibition against cruel and unusual punishment applies only to punishments. It does not apply to equally burden-

some regulatory measures that may be characterized as cruel and even unusual." *Opinion of the Justices*, 423 Mass. 1201, 1238 (1996). It is axiomatic that G. L. c. 140, § 131, is a regulatory statute, and that its prohibition on the issuance of a license to carry firearms to an individual who has been adjudicated a delinquent child for the commission of a felony is not a criminal penalty. See *Dupont* v. *Chief of Police of Pepperell*, 57 Mass. App. Ct. 690, 694 (2003) ("statute governing who may carry firearms is not punitive"). Therefore, the Eighth Amendment prohibition against cruel and unusual punishment is not applicable to Chardin's circumstances.[23]

5. *Conclusion.* General Laws c. 140, § 131 (*d*) (i), does not infringe on Chardin's right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution. Accordingly, this case is remanded to the county court where the single justice shall enter a judgment denying the petition.

*So ordered.*

---

[23]We make one final observation. Chardin is not without a potential remedy. The power to pardon is conferred by Part II, c. 2, § 1, art. 8 of the Constitution of the Commonwealth, as amended by art. 73 of the Amendments, which reads, in part: "The power of pardoning offences . . . shall be in the governor, by and with the advice of council; provided, that if the offense is a felony the [G]eneral [C]ourt shall have power to prescribe the terms and conditions upon which a pardon may be granted . . . ." See *Opinion of the Justices*, 301 Mass. 615, 617 (1938) (power to pardon applies to "offences"). Cf. *Commonwealth* v. *Wilcox*, 446 Mass. 61, 68 & n.17 (2006) ("offences" may be defined somewhat more comprehensively than "crimes"). General Laws c. 127, § 152, provides that "[i]n a case in which the governor is authorized by the constitution to grant a pardon, he may, with the advice and consent of the council, and upon the written petition of the petitioner, grant it, subject to such conditions, restrictions and limitations as he considers proper . . . ." See *Commonwealth* v. *Vickey*, 381 Mass. 762, 768-769 (1980) (discussing history of pardons). Further, "[u]pon approval of a petition for pardon, the governor shall direct all proper officers to seal all records relating to the offense for which the person received the pardon. Such sealed records shall not disqualify a person in any . . . application for employment or other benefit, . . . including . . . licenses, . . . nor shall such sealed record be admissible in evidence or used in any way in any court proceeding or hearing before any board, commission or other agency . . . ." G. L. c. 127, § 152.