Firearms Records Bureau vs. Jay E. Simkin & others.[1]

Suffolk. April 4, 2013. - August 8, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, & Lenk, JJ.

*Firearms. Practice, Civil,* Action in the nature of certiorari, Judicial review of license to carry firearms. *License. Statute,* Construction. *Administrative Law,* Regulations. *Words,* "Suitable person."

The "suitable person" requirement for a license to carry a firearm set forth in G. L. c. 140, § 131, a comprehensive firearms licensing scheme, applied to a temporary nonresident license to carry firearms issued pursuant to G. L. c. 140, § 131F [172-178]; further, a decision of the firearms records bureau revoking the defendant's temporary nonresident license was arbitrary and capricious, where the defendant's arguably unusual but otherwise innocuous actions (i.e., carrying concealed firearms to a medical appointment and providing a pseudonym and indirect contact information to the medical office), viewed in their totality, did not provide a reasonable ground to deem him no longer a suitable person to carry firearms [178-183].

Civil action commenced in the Superior Court Department on February 1, 2011.

The case was heard by *Bonnie H. MacLeod,* J., on motions for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*Penny Dean* for Jay E. Simkin.

*David R. Marks,* Assistant Attorney General, for the plaintiff.

*Karen L. MacNutt & J. Steven Foley,* for Commonwealth Second Amendment, Inc., amicus curiae, submitted a brief.

Cordy, J. Jay E. Simkin, a New Hampshire resident, held a temporary nonresident Class A unrestricted license to carry firearms in Massachusetts (license). Following an incident that occurred on November 6, 2009, the firearms records bureau[2]

---

[1] Justices of the Chelsea Division of the District Court Department of the Trial Court, as nominal parties.

[2] The firearms records bureau (bureau) has been designated by the colonel

(bureau) revoked Simkin's license, deeming him no longer a "suitable person" to possess it. A judge in the District Court ordered that Simkin's license be reinstated. The bureau appealed the decision to the Superior Court, where a judge ruled in favor of the bureau and vacated the order of the District Court. We granted Simkin's application for direct appellate review to consider whether the "suitable person" requirement set forth in G. L. c. 140, § 131, applies to temporary nonresident licenses issued pursuant to G. L. c. 140, § 131F. Although we conclude that it does, we also conclude that in the absence of regulations further defining unsuitability, no reasonable ground existed to revoke Simkin's license. Accordingly, we reverse the judgment of the Superior Court.[3]

1. *Background.* We summarize the relevant facts as found by the District Court judge, supplemented where necessary by undisputed facts in the record. Simkin is a New Hampshire resident and a federally licensed firearms dealer who is engaged in the "buying and selling [of] firearms in the region, from private parties, at gun shows, and at auctions." Since 2002, he has held a temporary nonresident Class A unrestricted license to carry firearms in Massachusetts. In February, 2009, Simkin applied to the bureau for a renewal of his license, stating as his purpose for requesting the renewal that he traveled in and through Massachusetts for business purposes, carrying firearms, ammunition, and cash, and carried concealed firearms for personal protection. The bureau renewed his license.

On November 6, 2009, Simkin traveled to Stoneham for a medical appointment. At the medical office, and in order to protect his privacy, Simkin used a pseudonym ("Horace Jones") and registered under a Maryland address. He also declined to provide a telephone number, and, at the conclusion of the medical examination, paid the $1,500 bill in cash. Prior to disrobing in the examination room, Simkin informed the medical assistant that he was armed and proceeded to secure his weapons (two

of the State police as the licensing authority for temporary nonresident licenses to carry firearms, pursuant to G. L. c. 140, § 131F, and is part of the Department of Criminal Justice Information Services, which itself is an administrative agency within the Executive Office of Public Safety and Security.

[3]We acknowledge the amicus brief filed by Commonwealth Second Amendment, Inc.

firearms, ammunition, and four knives) in a locked briefcase for the duration of the examination. Employees of the medical office were "alarmed" and "concerned for their safety" based on Simkin's conduct, and one of the employees contacted Stoneham police much later that day to report their concerns.[4]

Stoneham police Detective Robert McKinnon contacted law enforcement officials in Maryland, who gave him the name of an individual who lived at the address in Maryland that Simkin had provided to the medical office. McKinnon made a telephone call to the individual at the address and explained that he wanted to speak to "Horace Jones." The individual asked why Mc-Kinnon was looking for "Jones," and after McKinnon told him, the individual explained that "Horace Jones" was a pseudonym used by a friend to protect his identity, that "Jones" lived in Nashua, New Hampshire, and that he would have "Jones" contact McKinnon. McKinnon then received a telephone call from an attorney, Marvin Greenberg, from Woburn. McKinnon informed Greenberg that he needed the true name of "Horace Jones" and documentation of his license to carry firearms in Massachusetts. In response, Simkin sent an electronic mail message to McKinnon in which he gave his real name, explained that he used a pseudonym at the medical office in order to protect his privacy, and indicated that he was licensed to carry concealed firearms. He attached to the message copies of his Massachusetts license and his Federal firearms license, as well as copies of receipts for payment for the medical services. McKinnon confirmed receipt and thanked Simkin for his cooperation.

McKinnon reported the incident to the bureau. By letter dated November 13, 2009, bureau director Jason A. Guida informed Simkin that his license was thereby revoked because, on the basis of the information provided to him by McKinnon and the manager of the medical office regarding the incident on November 6, Guida determined that Simkin was no longer a

---

[4]Simkin had previously visited the same medical office on October 20, 2009, without incident. He registered using the same pseudonym and contact information, paid in cash, informed the doctor that he was armed, and secured his weapons during the examination.

"suitable person" to possess a firearm in Massachusetts.[5] Specifically, Guida made this determination on the basis that (1) Simkin's visit to the medical office while "heavily armed" fell outside the "business activity" of buying and selling firearms that Simkin indicated on his license application as the reason he sought the license; (2) Simkin caused "fear and alarm" at the medical office; and (3) Simkin used a false name in order to conceal his identity.

Simkin filed a petition for judicial review in the District Court seeking various forms of relief, including an order vacating the revocation of his license. The parties then filed cross motions for summary judgment. A judge found in favor of Simkin and ordered that his license be reinstated. She concluded that "suitability" was not an appropriate ground for license revocation because it is not one of the five disqualifying factors set forth in G. L. c. 140, § 131F,[6] which governs temporary nonresident licenses to carry firearms. Further, the judge reasoned that even if suitability were an appropriate ground for revocation, there was no reasonable ground for the bureau to have found Simkin unsuitable arising from his visit to the medical office. First, because Simkin's license was unrestricted, he was entitled to carry firearms "for all lawful purposes," G. L. c. 140, § 131 (*a*), including personal protection. Second, there was no support for the bureau's contention that Simkin did anything to cause fear and alarm at the medical office apart from the fact that he was carrying concealed weapons, something that he was lawfully entitled to do. Third, although Simkin used a pseudonym while receiving medical treatment in order to protect his privacy, there was no suggestion that Simkin was committing a crime or perpetrating a fraud.

The bureau filed an action in the nature of certiorari, pursuant to G. L. c. 249, § 4, in the Superior Court, seeking review of the District Court judge's decision. The parties filed cross motions for judgment on the pleadings. A judge in the Superior

---

[5]The revocation letter was copied to the police department in Nashua, New Hampshire, where Simkin resides, and to the Boston office of the Bureau of Alcohol, Tobacco, Firearms and Explosives. After investigation by those authorities, Simkin continues to hold his New Hampshire and Federal firearms licenses.

[6]See note 9, *infra.*

Court allowed the bureau's motion, denied Simkin's motion, and vacated the order of the District Court reinstating Simkin's license. The judge concluded that the "suitable person" requirement set forth in G. L. c. 140, § 131, *is* applicable to temporary nonresident licenses issued pursuant to G. L. c. 140, § 131F. Further, she concluded that "reasonable grounds" existed for the bureau to determine that Simkin was not a "suitable person" based on his "unusual" behavior at the medical office, which caused the staff to be "concern[ed] for their safety," as well as "the disconnect between [Simkin's] business-related licensure and his possible need to protect himself with two guns, four knives, and several magazines of spare ammunition inside a physician's office."[7] We now address both issues.

2. *Discussion.* a. *Applicability of "suitability" requirement to temporary nonresident licenses.* General Laws c. 140, § 131 (§ 131), provides, in relevant part:

> "*All licenses to carry firearms* shall be designated Class A or Class B, and the issuance and possession of any such license *shall be subject to the following conditions and restrictions*:
>
> "....
>
> "*(f)* A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed.[8] *A license may be revoked or suspended by the licensing authority if it appears that the*

---

[7]Quoting from the bureau's letter to Simkin dated November 13, 2009, informing him that his license was revoked, the judge described Simkin as being "heavily armed" during his visit to the medical office. That characterization apparently originated from the manager of the medical office, whom the bureau interviewed as part of its investigation into the matter.

[8]With respect to the categories disqualifying a resident from receiving a license, G. L. c. 140, § 131 (§ 131), provides:

> "*(d)* Any person residing or having a place of business within the jurisdiction of the licensing authority . . . may submit to such licensing authority or the colonel of state police, an application for a Class A or Class B license to carry firearms, or renewal of the same, which such licensing authority or said colonel may issue if it appears that the ap-

*holder is no longer a suitable person to possess such a license.*" (Emphases added.)

In turn, G. L. c. 140, § 131F (§ 131F), provides, in relevant part:

"A Class A or Class B temporary license to carry firearms . . . may be issued by the colonel of the state police, or persons authorized by him, to a nonresident . . . subject to such terms and conditions as said colonel may deem

plicant is a suitable person to be issued such license . . . unless the applicant:

"(i) has, in any state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (a) a felony; (b) a misdemeanor punishable by imprisonment for more than two years; (c) a violent crime as defined in [§ 121]; (d) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; or (e) a violation of any law regulating the use, possession or sale of controlled substances as defined in [G. L. c. 94C, § 1];

"(ii) has been confined to any hospital or institution for mental illness, unless the applicant submits with his application an affidavit of a registered physician attesting that such physician is familiar with the applicant's mental illness and that in such physician's opinion the applicant is not disabled by such an illness in a manner that should prevent such applicant from possessing a firearm;

"(iii) is or has been under treatment for or confinement for drug addiction or habitual drunkenness, unless such applicant is deemed to be cured of such condition by a licensed physician, and such applicant may make application for such license after the expiration of five years from the date of such confinement or treatment and upon presentment of an affidavit issued by such physician stating that such physician knows the applicant's history of treatment and that in such physician's opinion the applicant is deemed cured;

"(iv) is at the time of the application less than 21 years of age;

"(v) is an alien;

"(vi) is currently subject to: (A) an order for suspension or surrender issued pursuant to [G. L. c. 209A, § 3B or § 3C,] or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to [c. 209A] or a similar order issued by another jurisdiction; or

"(vii) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction."

proper; provided, however, that no license shall be issued to a person [falling into any one of five enumerated disqualifying categories not applicable here].[9]

" . . . .

"Such license shall be valid for a period of one year but the colonel may renew such license, if in his discretion, such renewal is necessary.

" . . . .

---

[9]With respect to the categories disqualifying a nonresident from receiving a license, G. L. c. 140, § 131F (§ 131F), provides:

"[N]o license shall be issued to a person who:

"(i) has, in any state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (a) a felony; (b) a misdemeanor punishable by imprisonment for more than two years; (c) a violent crime as defined in [§ 121]; (d) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; or (e) a violation of any law regulating the use, possession or sale of controlled substances, as defined in [G. L. c. 94C, § 1];

"(ii) has been confined to any hospital or institution for mental illness, unless the applicant submits with his application an affidavit of a registered physician attesting that such physician is familiar with the applicant's mental illness and that in such physician's opinion the applicant is not disabled by such an illness in a manner that should prevent such applicant from possessing a firearm;

"(iii) is or has been under treatment for or confinement for drug addiction or habitual drunkenness, unless such applicant is deemed to be cured of such condition by a licensed physician, and such applicant may make application for said license after the expiration of five years from the date of such confinement or treatment and upon presentment of an affidavit issued by such physician stating that such physician knows the applicant's history of treatment and that in such physician's opinion the applicant is deemed cured;

"(iv) is currently subject to: (A) an order for suspension or surrender issued pursuant to [G. L. c. 209A, § 3B or § 3C,] or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to [G. L. c. 209A] or a similar order issued by another jurisdiction; or

"(v) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction."

"The fee for an application for the license shall be [one hundred dollars], which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial."

Simkin contends that his license is governed solely by § 131F, which, in his view, is a wholly self-contained statute governing temporary nonresident licenses to carry firearms. If this were true, Simkin's license could not be revoked on the basis of suitability, because although § 131F sets forth five specific disqualifiers, see G. L. c. 140, § 131F $(i)$-$(v)$, nowhere does it feature the "suitable person" requirement found in § 131 $(f)$. The bureau counters that § 131 establishes a comprehensive licensing scheme applicable to *all* licenses to carry firearms in Massachusetts, with § 131F providing supplementary rules for temporary nonresident licenses. The suitability requirement set forth in § 131 $(f)$ would therefore apply to temporary nonresident licenses such as Simkin's. We agree with the bureau's position.

We interpret a statute "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *O'Brien* v. *Director of the Div. of Employment Sec.*, 393 Mass. 482, 487 488 (1984), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). "[T]he statutory language itself is the principal source of insight into the legislative purpose." *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). "A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001).

The first paragraph of § 131 reads: "*All licenses* to carry firearms shall be designated Class A or Class B, and the issuance and possession of *any such license* shall be subject to the following conditions and restrictions: . . ." (emphasis added). The plain language of the first paragraph thus strongly suggests that § 131 applies to all licenses to carry firearms, including

those issued to nonresidents. The first paragraph also makes clear that *all* licenses are designated either Class A or B, and that "any such license" — in other words, *any* license to carry firearms in Massachusetts — is subject to the conditions imposed by § 131. Meanwhile, although § 131F provides that "[a] Class A or Class B temporary license to carry firearms . . . may be issued . . . to a nonresident," § 131F does not define what is meant by either "Class A" or "Class B." Rather, those terms are defined only in § 131. See G. L. c. 140, § 131 (*a*) & (*b*). The clear implication is that a license like Simkin's — a Class A temporary nonresident license to carry firearms — is "subject to the . . . conditions and restrictions" imposed by § 131, in addition to being subject to the provisions unique to temporary nonresident licenses imposed by § 131F.

An interpretation that subjects all licenses, including temporary nonresident licenses, to the suitable person requirement set forth in § 131 (*f*) is consistent with "[t]he goal of firearms control legislation in Massachusetts[, which] is to limit access to deadly weapons by irresponsible persons." *Ruggiero* v. *Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 258 (1984). Standing alone, § 131F would create an inherently deficient nonresident licensing scheme. Section 131 is a comprehensive, wide-ranging statute governing all aspects of licensure. See *Hightower* v. *Boston*, 693 F.3d 61, 65-68 (1st Cir. 2012) (detailing Massachusetts firearms licensing scheme as established by § 131). It, among other things, defines in detail the two classes of licenses (Class A and Class B) in § 131 (*a*) and (*b*); establishes eligibility requirements in § 131 (*d*); sets out the procedures by which the licensing authority must process and evaluate applications in § 131 (*e*); addresses revocation and suspension of licenses and the procedures by which aggrieved parties may file appeals in § 131 (*f*); specifies the shape, size, and other attributes of the license itself in § 131 (*g*); and imposes civil and criminal penalties for various transgressions, such as providing false information in a license application, in § 131 (*h*).

If § 131 were inapplicable to nonresidents, as Simkin argues, it would undermine the basic public safety objectives of the firearms licensing scheme. Most notably, although § 131F states that the license application fee "shall not be prorated or refunded

in the event of revocation," G. L. c. 140, § 131F, tenth par., it sets forth no standards or procedures for revocation and in fact contains no other reference to revocation. Where the Legislature contemplated revocation of a temporary nonresident license, yet made no provision for such revocation in § 131F, it follows that the revocation provisions set forth in § 131 (*f*), including the suitability requirement, are intended to apply to all licenses to carry firearms.[10] If § 131F were viewed in isolation, then the absence of language authorizing revocation could be construed to mean that a nonresident license to carry firearms could never be revoked, irrespective of a license holder's conduct.

In support of his argument that the provisions of § 131, including the suitable person requirement, have no application to temporary nonresident licenses issued pursuant to § 131F, Simkin identifies four variations between § 131 and § 131F that he contends demonstrate that they create two separate and distinct licensing regimes, one for residents and one for nonresidents. Simkin places the most emphasis on the fact, which we have already acknowledged, that § 131F contains five enumerated disqualifiers but does not mention suitability.[11] We are not persuaded by Simkin's argument. The suitable person requirement in § 131 is not set forth as a specific, enumerated disqualifier, but instead as a general prerequisite to the issuance of a license in § 131 (*d*), and as a ground for revocation or suspension of a license in § 131 (*f*). Therefore, it is not surprising that § 131F, which lists only the specific, enumerated disqualifiers but does not discuss eligibility or revocation in more general terms, does not speak in terms of suitability. Moreover, although the Legislature certainly could have chosen to incorporate by reference in § 131F the disqualifiers set forth in § 131, excepting the disqualifiers for age and alienage, its decision to simply restate the applicable disqualifiers is hardly conclusive evidence that § 131F was intended to create a free-standing nonresident licensing scheme.

Simkin also relies on the following variations: First, resident

---

[10]Similarly, § 131F makes no provision for judicial review of revocations, denials, or nonrenewals.

[11]The five enumerated disqualifiers in § 131F are virtually identical to those set forth in § 131 except that § 131F omits disqualifiers for applicants less than twenty-one years of age and aliens. See notes 8 and 9, *supra.*

licenses to carry expire on a license holder's birthday pursuant to § 131 (*i*), whereas Simkin's temporary nonresident license expired one year from its effective date. Second, although § 131 (*i*) has a ninety-day postexpiration grace period for license renewals, § 131F has no such provision. In our view, these two variations derive from the fact that resident licenses are valid for a period "not less than 5 years but not more than 6 years from the date of issue" and, therefore, designate the license holder's birthday as a convenient expiration date. G. L. c. 140, § 131 (*i*). In contrast, nonresident licenses are valid for a much shorter period of one year, G. L. c. 140, § 131F, eighth par., and therefore setting the expiration date as the license holder's birthday would create too much variance in the period of validity from one nonresident license holder to another. The applicability of a ninety-day grace period to resident licenses but not to nonresident licenses can also be explained by the relatively short, one-year period of validity applicable to nonresident licenses. Moreover, as a general matter, it is undisputed that § 131F does differ in certain respects from § 131; these differences, however, are consistent with the role of § 131F as a supplement, applicable to nonresidents, to the general licensing scheme established by § 131.[12]

    b. *Whether the bureau had reasonable grounds to conclude*

---

[12]Simkin cites three additional pieces of evidence in support of his argument that § 131 and § 131F are separate and distinct legal provisions. First, unlike § 131 (*e*), which provides that an application for a license to carry shall be approved or denied within forty days of the application date, § 131F has no processing time limit. Simkin's only basis for arguing that the forty-day limit from § 131 (*e*) does not apply is that on reinstating his license pursuant to the District Court order, the bureau informed him that he would need to apply for renewal of his license "at least 90 days prior to expiration" in order to avoid a licensing gap. It is therefore unclear that the forty-day processing time limit set forth in § 131 (*e*) does not apply to nonresident license applications, and we need not decide the matter. Even if the forty-day limit does not apply to nonresident applications, this is hardly evidence that § 131 and § 131F were intended as completely independent provisions.

    Second, the record demonstrates that from 2004 until 2009, the physical license that the bureau issued to Simkin did not comply with the physical license requirements set forth in G. L. c. 140, § 131 (*g*), as amended by St. 2004, c. 150, § 10. Simkin argues this discrepancy suggests that the bureau believed § 131 (*g*) was inapplicable to nonresident licenses. There is nothing in the record regarding whether licenses issued to residents during the same time period complied with these requirements. Even assuming they did, while the bureau's failure to comply with the physical license requirements of § 131 (*g*)

*Simkin was not a "suitable person."* The licensing authority, in this case the bureau, is vested with " 'considerable latitude' or broad discretion in making a licensing decision." *Chardin* v. *Police Comm'r of Boston*, 465 Mass. 314, 316 (2013) (*Chardin*), quoting *Ruggiero* v. *Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 259 (1984). If a license is revoked, the aggrieved party may file, within ninety days after receiving notice of revocation, "a petition to obtain judicial review in the district court." G. L. c. 140, § 131 (*f*). Revocation of a license to carry firearms based on lack of suitability will be upheld unless the license holder demonstrates that revocation was "arbitrary, capricious, or an abuse of discretion." *Chief of Police of Shelburne* v. *Moyer*, 16 Mass. App. Ct. 543, 546 (1983). See *Chardin, supra* at 317. A District Court judge may overturn a firearms licensing decision as arbitrary or capricious where "no reasonable ground" exists to support the decision. G. L. c. 140, § 131 (*f*). See *Chardin, supra*; *Godfrey* v. *Chief of Police of Wellesley*, 35 Mass App. Ct. 42, 44-45 (1993). Further judicial review is available by way of an action in the nature of certiorari,

---

for nonresident licenses is questionable, it is not indicative of legislative intent regarding the licensing scheme.

Finally, Simkin relies on two opinions of the Attorney General that suggest that § 131 and § 131F are separate and distinct legal provisions. In a 1964 opinion, Attorney General Edward W. Brooke opined in response to a question from the Acting Commissioner of the Department of Public Safety, that a license issued to a resident pursuant to G. L. c. 140, § 131, would become invalid if the license holder took up residence in another state. See Rep. A.G., Pub. Doc. No. 12, at 233-234 (1964). In reaching this conclusion, the Attorney General stated:

> "This position is further buttressed by the fact that the Legislature provided different qualifications for the issuance of permits to nonresidents in [G. L. c. 140, § 131F].

> "A clear implication of this section is that a non-resident is within a wholly different status and as such must comply with the requirements of § 131F. Consequently, a license holder who becomes a non-resident of Massachusetts would no longer fall within the jurisdiction of local licensing authorities and § 131 would no longer apply."

*Id.* at 234. The other opinion, issued by Attorney General Francis X. Bellotti in 1986, only nominally supports Simkin's position and does not merit discussion here. See Rep. A.G., Pub. Doc. No. 12, at 62-63 (1986). For reasons discussed *supra*, we disagree with both opinions insofar as they suggest that § 131F is wholly distinct from § 131.

pursuant to G. L. c. 249, § 4. See *Chardin, supra,* and cases cited. On certiorari review, the Superior Court's role is to examine the record of the District Court and to "correct substantial errors of law apparent on the record adversely affecting material rights." *Cambridge Hous. Auth.* v. *Civil Serv. Comm'n,* 7 Mass. App. Ct. 586, 587 (1979), and cases cited.

The term "suitable person" is not defined in G. L. c. 140, § 131. Nor is it defined by any regulation promulgated by the Executive Office of Public Safety and Security or its designee pursuant to its statutory authority. See G. L. c. 140, § 131 (*r*). Further, the limits of unsuitability have not been clearly established by our case law. However, as an initial matter, it is apparent that the licensing authority may deem a license holder unsuitable for reasons falling outside the enumerated disqualifiers set forth in § 131 (*d*) (for residents)[13] or § 131F (for non-residents),[14] as § 131 (*f*) states that a license "shall be revoked or suspended . . . upon the occurrence of any event that would have disqualified the holder from being issued such license," and separately states that "[a] license may be revoked or suspended . . . if it appears that the holder is no longer a suitable person to possess such license." Accordingly, a person may be found unsuitable for a variety of reasons, including conduct that falls outside of the enumerated disqualifiers and conduct that falls short of criminal behavior. See *DeLuca* v. *Chief of Police of Newton,* 415 Mass. 155, 158-160 (1993) (finding of unsuitability based on criminal convictions that were subject of governor's pardon); *Howard* v. *Chief of Police of Wakefield,* 59 Mass. App. Ct. 901, 902 (2003) (finding of unsuitability based on prior issuance of then-expired abuse prevention orders); *Godfrey* v. *Chief of Police of Wellesley, supra* at 47-48 (finding of unsuitability based on license holder's refusal to cooperate with prior police investigation); *MacNutt* v. *Police Comm'r of Boston,* 30 Mass. App. Ct. 632, 635 (1991) (proper for licensing authority to condition suitability determination on passing test of firearm handling and firing proficiency); *Superintendent, Mass. State Police* v. *Grover,* 76 Mass. App. Ct. 1117 (2010) (unpublished) (finding of unsuitability based on license holder's

[13]See note 8, *supra.*
[14]See note 9, *supra.*

violent acts not resulting in criminal prosecution). See also *Hightower* v. *Boston*, 693 F.3d 61, 74-76 (1st Cir. 2012) (rejecting Second Amendment challenge to revocation of plaintiff's license on suitability grounds after she provided false information in license renewal application).

Simkin contends that the bureau's decision to revoke his license on suitability grounds based on his conduct at the medical office was "frivolous, arbitrary, capricious, in bad faith, an abuse of discretion, and unjust," for the simple reason that Simkin did nothing wrong. The bureau counters that it was properly within its "broad discretion," *Chardin, supra* at 316, to deem Simkin unsuitable because his "decision to enter a professional medical office heavily armed while lying about his identity demonstrated poor judgment and unnecessarily alarmed the employees of the medical office." We agree with Simkin's position and disagree with the bureau's, essentially for the reasons set forth in the District Court judge's memorandum of decision.

The bureau contends that when taken together, Simkin's conduct of showing up to a medical appointment "heavily armed"; "[taking] elaborate measures to conceal his identity, including giving a false name and address, paying for the services in cash, and withholding most other identifying information"; and causing the employees of the medical office to be "understandably alarmed" and "concerned for their safety" is sufficient to support a determination that Simkin was no longer a suitable person to possess a license to carry firearms. In making its argument, the bureau places particular emphasis on Simkin's "concealment of his true identity and address in the context of his exercise of the authority granted by the license to carry," as well as the fact that his carrying of concealed firearms to a medical appointment fell "outside the ostensible business-related reasons he originally gave as his reason for applying for the license."

Although the bureau is correct that a license holder's conduct need not constitute a violation of the law or statutorily disqualify the license holder in order to form the basis for a revocation on unsuitability grounds, the bureau's discretion to make a suitability determination is not without limits. A revocation will be overturned as arbitrary or capricious where "no reasonable ground" exists to support it. G. L. c. 140, § 131 (*f*). See *Chardin, supra* at 317. Even when viewed in their totality, Simkin's

arguably unusual but otherwise innocuous actions did not provide a "reasonable ground" to deem him no longer a "suitable person" to carry firearms. This is particularly the case where the Executive Office of Public Safety and Security or its designee has not promulgated any regulations governing suitability, and therefore has provided applicants and license holders with little guidance on what it means to be a "suitable person." In the absence of any such regulations, individual suitability determinations become more susceptible to attack on the ground that they are arbitrary and capricious.

Simkin held an unrestricted Class A license to carry firearms. Although Simkin indicated on his license application that he sought the license for reasons of personal protection related to his business activities, the license itself carried no restrictions; it entitled Simkin to carry firearms "for all lawful purposes." G. L. c. 140, § 131 (*a*). The argument that Simkin's carrying of firearms to his medical appointment demonstrated unsuitability because the appointment was not related to his business activities is therefore meritless. The contention that Simkin's being "heavily armed" contributed to his unsuitability is similarly meritless, where that characterization originated with the manager of the medical office (of unknown expertise with firearms), and where Simkin's license permitted him to carry more than one firearm.[15] See G. L. c. 140, § 131 (*a*).

Next, we suspect that the average Massachusetts resident may become "alarmed" on learning that someone other than a law enforcement officer is carrying concealed weapons in his or her presence. However, Simkin is not responsible for alarm caused to others by his mere carrying of concealed weapons pursuant to a license permitting him to do exactly that. Although the bureau claims that Simkin "went out of his way to show and inform certain staff members that he was . . . armed," the record indicates otherwise. Simkin concealed his weapons until he was in the examination room and was about to disrobe, at

---

[15]Simkin vehemently objects to the bureau's contention that he was "heavily armed." He insists that he was "adequately armed," taking into account the risk that one or more of his firearms might malfunction. As his counsel articulated at oral argument, " 'The rule' is: One gun, no gun; two guns, one gun; three guns, two guns."

which time he notified the medical assistant that he was carrying concealed weapons and was going to secure them, presumably so that she would *not* be alarmed. Further, he had disclosed the fact that he was armed immediately prior to disrobing during a previous visit to the same medical office, albeit to a different practitioner, and had received no objection to his behavior either during or after the visit.

Finally, there is the matter of Simkin's concealment of his true identity at the medical office. The record shows that Simkin used a pseudonym and provided indirect contact information for the purpose of protecting his medical privacy. There is no suggestion that Simkin was attempting to commit a crime or perpetrate a fraud. Once he learned that the authorities (specifically, Detective McKinnon) wished to speak to him regarding his license, he was compliant and forthright. This is therefore not a case where an applicant or license holder has attempted to mislead the licensing authority. Contrast *Hightower* v. *Boston*, *supra* at 68-69. A different case might have been presented if the Executive Office of Public Safety and Security or its designee had promulgated regulations pertaining to the use of a pseudonym while carrying concealed firearms pursuant to a license issued in a license holder's legal name, but as already mentioned, no such regulations exist. Accordingly, we have no occasion to consider whether any such regulations could permissibly prohibit using a pseudonym in the manner that Simkin did here.

3. *Conclusion.* For the reasons stated, the judgment of the Superior Court is reversed. Simkin's request for attorney's fees and costs pursuant to G. L. c. 231, § 6F, is denied. The case is remanded to the Superior Court for entry of a judgment reinstating Simkin's license.

*So ordered.*