NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1045                                     Appeals Court

        RICHARD PHIPPS  vs.  POLICE COMMISSIONER OF BOSTON.


                       No. 16-P-1045.

     Suffolk.     September 28, 2017. - January 30, 2019.

          Present:  Vuono, Agnes, & McDonough, JJ.


Firearms.  License.  Practice, Civil, Judicial review of license
     to carry firearms.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on July 29, 2014.

     After transfer to the Superior Court Department, motions
for judgment on the pleadings were heard by Mary K. Ames, J.


     James A. Reidy for the plaintiff.
     Katherine Sarmini Hoffman, Special Assistant Corporation
Counsel, for the defendant.


     McDONOUGH, J.  Concerned for his safety and the protection

of his property, the plaintiff, Richard Phipps, a victim of an

armed robbery at his small retail business, successfully applied

to the police commissioner (commissioner) of the city of Boston

(city) for a license to carry a firearm pursuant to G. L.

c. 140, § 131.  However, the commissioner, through the city police department's (department) licensing unit, restricted Phipps's license to target practice and hunting only, uses not germane to his activities or intended purposes.  At a meeting with the commander of the department's licensing unit, Phipps sought to persuade the commander to remove the restriction; instead, based upon their conversation, the commander revoked Phipps's license, deeming him no longer a suitable person to possess a license.  A judge of the Dorchester Division of the Boston Municipal Court Department (BMC) denied Phipps's request for judicial review of the license revocation and restriction. Phipps sought further review in the Superior Court where, on cross motions for judgment on the pleadings, the revocation was affirmed.  Because Phipps's license was restricted and then revoked based upon a generalized, subjective determination of unsuitability rather than specific, reliable information as required by our case law, and because Phipps demonstrated a proper purpose in seeking an unrestricted license, we reverse.

Background.  1.  Facts.  We summarize the relevant facts from the record as follows.  Phipps is a resident of Boston, where he is part owner and operator of a small retail business located at Dudley Square in the Roxbury section of Boston. Phipps's duties at the store include closing the store at night

and making cash deposits at a nearby bank.  Previously, while closing his store one night, Phipps had been robbed at gunpoint.[1]

In April, 2013, Phipps applied to the licensing unit of the department for a license to carry a firearm.  His initial contact at the police station in the Dorchester section of Boston was Officer Angela Coleman of the firearms licensing unit, who briefly interviewed him to ascertain whether he was suitable to hold a firearms license.  Officer Coleman took Phipps's handwritten application and created a new application on her computer.  Despite Phipps telling Officer Coleman he needed a license for protection, Officer Coleman, on her own, typed in "sport and target" as Phipps's reason for requesting a license.  In doing so, Officer Coleman explained to Phipps that because the city was "not really giving out license[s] to carry," the department issued most licenses with restrictions, and that after he received his license, he could then apply to the commander of the licensing unit to have the restriction

---

[1] In addition, Phipps's business partner, Wayne Atkinson, had been a victim of two armed robberies while working at one of the business's other locations.  The department issued Atkinson an unrestricted license to carry firearms.  Because Atkinson was robbed twice at their business, and because Phipps was "carrying large sums of money," Atkinson advised Phipps that "it was a very good idea for him to apply" for a license to carry a firearm.

removed.  Phipps accepted this explanation and signed the application.[2]

About five months later, Phipps received a Class A license to carry a firearm.  The license was restricted to "target and hunting."[3]  On September 30, acting on Officer Coleman's earlier advice, Phipps wrote a letter to the commander of the licensing unit, Lieutenant Detective John McDonough, requesting removal of the target and hunting restriction.  In his letter, Phipps explained he needed an unrestricted license because (1) he is a business owner, (2) he regularly makes deposits of large sums of money, (3) he frequently must visit high crime areas in Roxbury and Dorchester, and (4) he had been the victim of crime in the past in the vicinity of his business after closing the store.  By letter dated October 8, 2013, Detective McDonough denied Phipps's request, stating without explanation that Phipps had

---

[2] At the BMC evidentiary hearing, Lieutenant Detective John McDonough confirmed that this was department policy, except for applicants who were either police officers or attorneys, who, once approved as suitable, were issued unrestricted licenses.

[3] In his complaint and throughout the record, the restriction on Phipps's license to carry is referred to as "target and sport shooting," even though the wording on his license is "target and hunting."  The discrepancy is insignificant.  In any event, there is nothing in the record suggesting that Phipps either engaged, or had an interest, in hunting or target or sport shooting.

not demonstrated a "proper purpose" for holding an unrestricted license.

According to the record of the BMC evidentiary hearing, Phipps thereafter telephoned Detective McDonough and again requested removal of the license restriction. Detective McDonough agreed to meet with Phipps at the police station so that they could speak further and directed Phipps to bring his license with him. Later that day, Phipps met with Detective McDonough in the latter's office at the police station in Dorchester. When Phipps arrived, Detective McDonough asked him for his license. Phipps handed it to McDonough, who put it in his pocket. Phipps began the meeting by telling Detective McDonough that he had written to him on Officer Coleman's recommendation as to how to remove the restriction on his license. Detective McDonough concluded that Phipps "was giving [him] the impression" that "Officer Coleman had authorized him to have an unrestricted license," that, in essence, he was "all set," and that his letter to McDonough was "just a formality."

Finding Phipps's story "very unusual" and seeking clarification, Detective McDonough called Officer Coleman[4] into the room. After Coleman joined them, Phipps claimed that

---

[4] The commissioner did not call Officer Coleman to testify at the BMC hearing. There is nothing in the record as to what, if anything, Coleman said after she joined the meeting.

McDonough was "misunderstanding it," and that Officer Coleman had only instructed him to write the letter.  McDonough then accused Phipps of "chang[ing] his story."  Detective McDonough then turned the conversation to Phipps's criminal court history.  Phipps had never been convicted of a crime.  Between 2005 and 2010 he was charged with various crimes, mostly nonviolent, including violations for possession or possession with intent to distribute a class D controlled substance, and various automobile violations, each charge eventually dismissed.[5]  McDonough testified that Phipps "downplayed his record," quoting Phipps as saying at the meeting:  "Oh, it's really not that bad.  It's only a little thing, minor.  It's all squashed [sic].  Not -- it's all, you know, no convictions, no nothing.  It's not a bad record."  With a printout of Phipps's history of dismissed charges in front of him, Detective McDonough -- without showing the printout to Phipps -- asked him his number of arraignments.

_____

[5] A printout of Phipps's board of probation report, admitted in evidence at the evidentiary hearing, revealed no convictions. The report reflected that charges in 2007 and 2010 for possession with intent to distribute a Class D controlled substance were dismissed following continuances without a finding; charges in 2005 and 2006 for simple possession or possession with intent to distribute a Class D substance were dismissed, as was a charge in 2006 for possession of a controlled substance in a school zone.  Also, in 2006 Phipps was arraigned on charges of disturbing the peace, interfering with a police officer, disorderly conduct, and resisting arrest.  On the latter charge, there was a disposition of no probable cause. The remaining charges were dismissed without conditions.

Phipps answered, "[F]our or five times."  After Detective
McDonough explained to Phipps the difference between an arrest
and an arraignment, Phipps claimed he had been arraigned "three
or four times."  Detective McDonough testified that Phipps had
been arraigned on twenty different charges.[6]

Dissatisfied with Phipps's responses during their meeting,
Detective McDonough informed Phipps he was no longer a suitable
person to hold a firearms license.  McDonough concluded that
Phipps spoke inaccurately in their meeting by (1) leaving the
"impression" with McDonough that Officer Coleman had already
approved him for an unrestricted license and then "changing
[his] story" when Coleman joined the meeting, (2) "downplay[ing]
his [criminal] record", and (3) inaccurately reporting "his
criminal history."  The meeting ended with Detective McDonough
keeping Phipps's license.  Thereafter, Phipps received a letter
from the commissioner informing him that his license to carry a
firearm had been revoked based on a determination that he was an
unsuitable person.  As reasons therefor, the letter stated that
(1) Phipps "inaccurately said [to Detective McDonough] that
[Officer] Coleman had recommended that he receive an

---

[6] We discern from Phipps's board of probation report that
between May, 2005, and December, 2010, Phipps appeared in court
for arraignment eight times covering an aggregate of twenty
charges, all eventually dismissed.

unrestricted [license to carry]," and in a meeting with both McDonough and Coleman, Phipps "changed his account," stating that "[Officer] Coleman had told him to write a letter to" McDonough; (2) Phipps "inaccurately understated the number of [his criminal] charges"; and (3) Phipps "again understated the content" of his record.

Pursuant to G. L. c. 140, § 131 (f), Phipps filed a petition in the BMC for judicial review of both the commissioner's decision to revoke his license and the imposition of the target and hunting restriction.[7]  Following an evidentiary hearing in which Phipps, his business partner Wayne Atkinson,[8] and Detective McDonough testified, a judge denied Phipps's petition without making any findings of fact or rulings of law. Phipps then filed an action in the nature of certiorari pursuant to G. L. c. 249, § 4, in the Supreme Judicial Court, which transferred the action to the Superior Court.  On cross motions

---

[7] As then in effect, G. L. c. 140, § 131 (f), did not explicitly provide for judicial review of license restrictions. Effective January 1, 2015, the right to appeal from license restrictions was made explicit.  See St. 2014, c. 284, § 51. Unless otherwise noted, all references herein to G. L. c. 140, § 131, refer to the statute as in effect at the time of the events in this case, i.e., 2013.  See St. 1998, c. 180, § 41. We do not suggest that our analysis or conclusions would be different under the current language of the statute.

[8] Atkinson had accompanied Phipps to the meeting with Detective McDonough.

for judgment on the pleadings, a judge of the Superior Court upheld the license revocation.[9]  This appeal followed.

2.  Standard of review.  a.  License revocation.  "Any applicant or holder aggrieved by a denial, revocation or suspension of a license [to carry] . . . may . . . file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license."  G. L. c. 140, § 131 (f).  If relief is denied in the District Court, the petitioner may then file "an action in the nature of certiorari pursuant to G. L. c. 249, § 4," in the Superior Court.  Frawley v. Police Comm'r of Cambridge, 473 Mass. 716, 727 (2016), quoting Firearms Records Bur. v. Simkin, 466 Mass. 168, 179-180 (2013).  "A District Court judge may overturn a firearms licensing decision as arbitrary or capricious where 'no reasonable ground' exists to support the decision.  G. L. c. 140, § 131 (f)."  Simkin, supra at 179.  "On certiorari review, the Superior Court's role is to examine the record of the [BMC] and to correct substantial errors of law apparent on the record adversely affecting material rights" (quotation omitted).  Id. at 180.

---

[9] Having upheld the BMC judge's denial of Phipps's petition for review of the commissioner's revocation of his license, the Superior Court judge did not reach the issue of the target and hunting restriction.

"Judicial review of the commissioner's decision [by this court] proceeds under the same standard" as a review conducted by the Superior Court.  Frawley, supra at 729.  "We stand in the same position as the [Superior Court] judge below in making that determination."  Id. at 729-730.  "The decision by a reviewing court is a ruling of law that does not require findings of fact, determinations of credibility, or the application of administrative expertise."  Id. at 729.  "[A] reviewing court simply must determine whether the commissioner, on the basis of the evidence before him, abused his discretion in a manner that adversely affected [Phipps's] material rights."  Id., citing Simkin, supra at 179-180.

b.  License restriction.  In determining whether to issue a license with restrictions, G. L. c. 140, § 131, outlines a "two-step inquiry" the licensing authority must undertake when evaluating an applicant.  Ruggiero v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 259 (1984).  First, as discussed above, the licensing authority must "ascertain whether the applicant is a 'suitable person' to possess a firearm.  [If so,] the licensing authority then must inquire whether the applicant [has] a 'proper purpose' for carrying a firearm."  Id.  This inclusion of a "proper purpose" requirement demonstrates the Legislature's intention that the licensing authority have the power to limit licenses to a specified purpose.  Id. at 260.

"In performing its task, the licensing authority is given considerable latitude."  Id. at 259.  See Chardin v. Police Comm'r of Boston, 465 Mass. 314, 316 (2013), citing Ruggiero, supra at 259 (licensing authority has "'considerable latitude' or broad discretion in making a licensing decision").  A reviewing court must determine, on the basis of the evidence, whether limiting the license to a specified purpose "would . . . make arbitrary, capricious or an abuse of discretion the commissioner's decision to deny the plaintiff a license for self-protection."  Ruggiero, supra at 261.

3.  Statutory scheme.  "The historical aim of licensure generally is preservation of public health, safety, and welfare by extending the public trust only to those with proven qualifications."  Leduc v. Commonwealth, 421 Mass. 433, 435 (1995), cert. denied, 519 U.S. 827 (1996).  Anyone wishing to lawfully carry a firearm in Massachusetts must either obtain a license to carry firearms pursuant to G. L. c. 140, § 131, or be exempt from the licensing requirements.[10]  Chardin, 465 Mass. at 315.  A "[l]icensing authority," defined as "the chief of police or the board or officer having control of the police in a city

---

[10] A person may also apply for a firearm identification card, which allows holders to own or possess a firearm, but only within their residence or place of business.  See G. L. c. 140, §§ 129B, 129C.

or town, or person authorized by them," G. L. c. 140, § 121, as appearing in St. 1998, c. 180, § 8, issues the firearms license. G. L. c. 140, § 131 (d). The Class A license, at issue here, authorizes the holder to possess and carry "firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." G. L. c. 140, § 131 (a). The licensing authority, in this case the commander of the licensing unit, is vested with "'considerable latitude' or broad discretion in making a licensing decision." Chardin, supra at 316, quoting Ruggiero, 18 Mass. App. Ct. at 259. If the licensing authority determines that the holder is no longer a suitable person to possess the license, it may be revoked or suspended, provided that the revocation or suspension is in writing and states the reasons therefor. G. L. c. 140, § 131 (f).

Discussion. 1. Revocation of Phipps's license. At the time of Phipps's application, the firearms licensing statute did not define "unsuitable" person. See G. L. c. 140, § 131.[11] Nor

---

[11] In 2014, the Legislature amended § 131 (d), providing, inter alia, criteria for finding an applicant unsuitable based on

"(i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that

was the term defined in any regulation promulgated by the
Executive Office of Public Safety and Security, see Simkin, 466
Mass. at 180, or by the Boston police department.[12]  Furthermore,
"the limits of unsuitability have not been clearly established
by our case law."  Id.  It is clear, however, that an individual
may be deemed unsuitable to possess a firearms license for
reasons other than the specifically enumerated disqualifiers set
out in G. L. c. 140, § 131 (d).[13]  Simkin, supra at 180.

---

suggests that, if issued a license, the applicant or
licensee may create a risk to public safety; or (ii)
existing factors that suggest that, if issued a license,
the applicant or licensee may create a risk to public
safety."

G. L. c. 140, § 131 (d), as appearing in St. 2014, c. 284, § 48.

[12] Specifically, when asked at the BMC hearing who within
the department "makes the determination of suitability for . . .
a license to carry a firearm," Detective McDonough answered, "I
do."  He further conceded that he alone, as the police
commissioner's "designee, . . . deemed Phipps unsuitable."

[13] "See DeLuca v. Chief of Police of Newton, 415 Mass. 155,
158-160 (1993) (finding of unsuitability based on criminal
convictions that were subject of governor's pardon); Howard v.
Chief of Police of Wakefield, 59 Mass. App. Ct. 901, 902 (2003)
(finding of unsuitability based on prior issuance of then-
expired abuse prevention orders); Godfrey v. Chief of Police of
Wellesley, [35 Mass. App. Ct. 42,] 47-48 [1993] (finding of
unsuitability based on license holder's refusal to cooperate
with prior police investigation); MacNutt v. Police Comm'r of
Boston, 30 Mass. App. Ct. 632, 635 (1991) (proper for licensing
authority to condition suitability determination on passing test
of firearm handling and firing proficiency) . . . .  See also
Hightower v. Boston, 693 F.3d 61, 74-76 (1st Cir. 2012)
(rejecting challenge under Second Amendment to United States
Constitution to revocation of plaintiff's license on suitability

Phipps submits that the decision to revoke his license on suitability grounds based on his conversation with Detective McDonough was "completely arbitrary," because it was based on Detective McDonough's "subjective belief" after a "10-15 minute conversation" that Phipps was unsuitable, a belief at odds with Detective McDonough's initial decision to issue Phipps the license. The commissioner counters that McDonough reasonably exercised his discretion to deem Phipps unsuitable and revoke his license because "[Phipps] inaccurately represented his prior communications with Officer Coleman and characterized the contents of his [r]ecord in a misleading manner." Relying principally on the decision of the United States Court of Appeals for the First Circuit in Hightower v. Boston, 693 F.3d 61, 74-76 (1st Cir. 2012), the commissioner submits that Detective McDonough properly revoked Phipps's license because he "provided inaccurate information during the application process, which is a valid consideration in the suitability determination." We are not persuaded.

While the commissioner is correct that a license holder need not violate the law or be statutorily disqualified to be deemed unsuitable, the "discretion to make a suitability determination is not without limits." Simkin, 466 Mass. at 181.

---

grounds after she provided false information in license renewal application)." Simkin, 466 Mass. at 180-181.

"The goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons." Ruggiero, 18 Mass. App. Ct. at 258.  As previously noted, while the statute as then in effect did not define "unsuitable" person, cases addressing the term have generally upheld the denial or revocation of licenses where a person has a documented risk to public safety.[14]  In this way, G. L. c. 140, § 131, achieves its purpose of "keep[ing] firearms out of the hands of persons who are not categorically disqualified, e.g., convicted felons, but who nevertheless pose a palpable risk that they would not use a firearm responsibly if allowed to carry in public."  Chief of Police of Worcester v. Holden, 470 Mass. 845, 854 (2015).  In fact, the statute passes muster under the United States and Massachusetts Constitutions precisely because it "bears a reasonable, as well as a real and substantial, relation to public health and safety."  Id.

Viewed as a whole, we conclude that Phipps's statements to Detective McDonough did not provide a "reasonable ground" for the revocation of his license.  The commissioner's stated reasons for revoking Phipps's license -- Phipps's mischaracterization to McDonough of his conversation with Coleman about the process to seek removal of the target and

---

[14] See note 13, supra.

hunting restriction on his license, and his failure to accurately recite to McDonough the number of charges and the arraignments from his court history -- are not reasonably related to the statute's goal of keeping firearms out of the hands of persons who could cause a risk to public safety. Put another way, even if Detective McDonough's testimony about his meeting with Phipps is accurate, nothing in the record reveals any reasonable nexus between what Phipps said in that meeting and a risk to public safety. While Detective McDonough may well have found Phipps's account of his conversation with Officer Coleman "[v]ery unusual," that is not a sufficient reason to revoke his license. See Simkin, 466 Mass. at 181-183 (license holder's use of false name to check into medical appointment and employees' fear and alarm upon learning he was carrying concealed weapons, while "arguably unusual but otherwise innocuous actions," held not sufficient grounds to revoke license to carry).

The same holds true for Phipps's understated opinion about the seriousness of his court history, and his imperfect memory of the number of times he had been arrested and arraigned, going back a number of years. We find it significant that in his BMC testimony, Detective McDonough downplayed Phipps's inaccurate answers to these questions. Referring to the printout of Phipps's history of dismissed charges, McDonough stated: "In

fairness to [Phipps], he had not seen it. It was on my desk and [Phipps] had not seen it in fairness to him." Furthermore, in his testimony, Detective McDonough acknowledged that there can be a difference between the number of arrests, the number of appearances for arraignment, and the number of charges.

Phipps's personal opinion that the dismissed charges against him were "minor" and that his record with no convictions was "really not that bad" had no bearing on Detective McDonough's ability to fully assess Phipps's history of dismissed charges to determine whether he was suitable. Even if Phipps unduly downplayed his history, that falls short of a "misrepresentation," which, "[i]n general, . . . must concern a fact, and not an opinion or belief."[15] Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 57 n.24 (2004).

Phipps's history of dismissed charges -- which only months earlier did not render him unsuitable -- cannot fairly be recast by the department based on Phipps's personal opinions about that history. Neither Phipps's "inaccurate" account of his

---

[15] At oral argument, counsel for the commissioner argued that Phipps "lied" to the detective during the interview. We discern no support in the record, either at the BMC hearing, or elsewhere, that either the department or the commissioner ever accused Phipps of making a false statement of material fact to either Coleman or McDonough, or of failing to disclose material information relevant to the questions of suitability and proper purpose.

conversation with Officer Coleman about the process for removing the target and hunting license restriction, nor his failure to accurately recite to McDonough the number of charges and arraignments from his court history, created an increased risk to public safety. Nor did any of Phipps's responses constitute the withholding of facts material to a licensing decision.

The First Circuit's decision in Hightower v. Boston, supra, upon which the commissioner principally relies, is not to the contrary. There, department policy required the plaintiff, a Boston police officer, to fill out an additional form and attach it to her application for renewal of her license to carry a firearm. Hightower, 693 F.3d at 68. One of the questions on that form asked whether she had any pending complaints or charges against her. She answered "no" when, according to the department, there were in fact several findings regarding rules violations pending against her arising out of an internal affairs investigation of another officer.[16] Once the licensing authority discovered the undisclosed pending complaints, her license was revoked. Id. at 68-69. The court concluded that

---

[16] According to the court, the parties disputed whether the "status of [the] matter" at the time Hightower filled out the form "amounted to 'pending' 'complaints or charges' within the meaning of the form." Hightower did not appeal from the revocation. Nor did she ever contact the department to "inquire as to whether she had in fact answered a question on the form untruthfully." Hightower, 693 F.3d at 69.

"the revocation of a firearms license on the basis of providing false information as to the existence of pending complaints or charges on the firearms license application form is not a violation of the Second Amendment [to the United States Constitution] in this case." Id. at 74. Thus, the court concluded that the "particular ground for 'unsuitability' [was] not subjective, and it [did] not confer too much discretion on the licensing authority." Id. at 76. Detective McDonough, in contrast, based his decision to revoke Phipps's license on his own "impression" that Phipps was "changing [his] story" about his conversation with Officer Coleman, and on McDonough's perception that Phipps "downplayed" his history of dismissed charges -- both subjective determinations, unlike the applicant's nondisclosure of material facts at issue in Hightower.[17] Phipps did not provide any inaccurate or false information on his license application,[18] and his entire criminal

---

[17] The Hightower court concluded that inaccurately answering "no" to a question about the existence of pending charges could, "depending on the nature of the underlying [undisclosed] complaints," materially impact suitability because "[a]n accurate answer to the question is important to allowing the licensing authority to investigate further and make an informed decision on the licensing application." Hightower, 693 F.3d at 76.

[18] The commissioner maintains that Phipps's inaccurate answers about his history of dismissed charges are the equivalent of providing false information in connection with a license application. The licensing statute provides a criminal penalty for anyone who gives false information concerning his

court history was known to Officer Coleman and Detective McDonough.

2.  The target and hunting license restriction.  The licensing authority must determine whether an applicant has "valid reasons for being licensed," including "good reason to fear injury to person or property."  Ruggiero, 18 Mass. App. Ct. at 258-259.  Phipps asserts that the target and hunting restriction placed on his license prior to its revocation violates G. L. c. 140, § 131.  The commissioner responds that the restriction is a proper exercise of the licensing authority's discretion to issue restricted licenses, pursuant to Detective McDonough's unwritten policy of issuing only restricted licenses to every first-time applicant who is not either a police officer or an attorney.[19]

Detective McDonough testified that the department had no written guidelines for use in determining whether an applicant

---

criminal record in an application for any form of firearm license or permit, G. L. c. 140, § 129, and also criminalizes knowingly filing a license application containing false information, G. L. c. 140, § 131 (h).  Without suggesting that the commissioner's argument is precluded, we note that nothing in the record indicates that Phipps was subsequently charged with either of these offenses.

[19] We find no language in the licensing statute that supports the department's apparent practice of denying unrestricted licenses to carry firearms to first-time applicants who, like Phipps, are neither police officers nor attorneys.

has demonstrated a "proper purpose" for carrying a firearm.[20]  In determining whether to remove restrictions on a license, Detective McDonough testified that he considers the following factors:  whether the applicant is a member of law enforcement, an attorney, or a business owner, whether the applicant can demonstrate a reason to fear for his personal safety, and the applicant's criminal history.  In response to Phipps's detailed written request to Detective McDonough for removal of the target and hunting restriction, in which Phipps explained that he was a victim of crime and that his business required him to deposit large sums of money on a regular basis, Detective McDonough informed Phipps by letter that his request was "denied because you could not show that you have a proper purpose to possess [an unrestricted] license."  McDonough's denial letter made no mention of Phipps's history of dismissed charges, nor did it set forth any reasoning or explanation why he believed Phipps "could not show [he had a] proper purpose."[21]  Here, even under

---

[20] At the BMC hearing, when asked on cross-examination whether the commissioner had provided him with any "regulations or guidelines . . . for making a determination of what is a proper purpose," Detective McDonough answered, "I don't think I have any."

[21] At the BMC hearing, McDonough agreed that his decision to restrict Phipps's license to target and hunting was his "normal course of procedure when processing licenses to carry," specifically, to restrict all first-time applicants' licenses to target and hunting except for police officers or attorneys, who, once approved as suitable, were issued unrestricted licenses.

Detective McDonough's stated criteria for evaluating an applicant's "proper purpose" in seeking an unrestricted license, Phipps demonstrated a "proper purpose."  He was a business owner who requested an unrestricted license to carry a firearm to protect himself and his property, in particular when closing his store at night and when carrying large amounts of cash to the bank, having already been a victim of robbery at gunpoint under that very circumstance.  Thus, Phipps demonstrated a proper purpose for the issuance of an unrestricted license to carry a firearm.  Contrast Ruggiero, 18 Mass. App. Ct. at 261.

Conclusion.  Because Phipps has demonstrated by substantial evidence his need to protect himself and his retail business, and because the department failed to show that it restricted and revoked his license to carry a firearm for objective reasons related to public safety, the department was without reasonable grounds to conclude he was an unsuitable person to possess a firearm for any lawful purpose.  The actions of the commissioner

---

In explaining the license restriction at the hearing, McDonough did cite Phipps's "criminal history" but without elaborating on any aspect of it.  Phipps had applied for and been denied a license to carry in 2009 (by an officer other than McDonough), which McDonough testified was due to his "criminal history."  In referring to Phipps's "criminal history" after the 2009 denial -- which, as noted, involved no convictions -- McDonough testified that "it wasn't substantial."  Phipps's record showed three arraignments after 2009, all occurring in December, 2010.  Two were for nonmoving motor vehicle violations; the third was for possession with intent to distribute a Class D substance, which was continued without a finding and then dismissed.

challenged here were arbitrary and capricious, in that the reasons given for the revocation and restriction of Phipps's license to carry a firearm bear no reasonable nexus to public safety.  The exercise of administrative discretion, no less than judicial discretion, must be limited to a consideration of "the factors relevant to the decision."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  Nothing we have said in this opinion should be read as diminishing in any way the broad discretion that the licensing authority has to determine whether an applicant for a firearms license is a suitable person and, if so, what restrictions, if any, should be imposed on such a license.

The judgment is reversed, and a new judgment shall enter in the Superior Court reinstating Phipps's license to carry a firearm, without restriction, for any lawful purpose.

So ordered.